UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMBER SULLIGAN, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-11668 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| FORD MOTOR COMPANY, a Delaware Limited Liability Company, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................... 1

II.    JURISDICTION ......................................................................... 7

III.    VENUE ....................................................................................... 8

IV.    PARTIES ................................................................................... 8

     A.    Plaintiff .......................................................................... 8

         1.    Amber Sulligan (Pennsylvania) ............................... 8

     B.    Defendant ..................................................................... 10

V.    FACTUAL ALLEGATIONS .................................................... 11

     A.    Ford marketed the Shutdown Defect Vehicles as functional, safe, reliable, and high-performance, and knew these attributes were material to consumers. ................................ 11

     B.    Ford's Vehicle Warranties ........................................... 16

     C.    The Shutdown Defect ................................................... 17

     D.    Ford knew or should have known of the Shutdown Defect before it disclosed the defect to Plaintiff. ......................... 19

         1.    Ford's durability testing should have uncovered the Shutdown Defect. ................................................... 20

         2.    Ford knew about the Shutdown Defect from warranty claims for Shutdown Defect Vehicles and its own investigation. ............................................................ 21

     E.    There is an agency relationship between Ford and Ford dealerships. .................................................................. 23

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ................. 26

     A.    Discovery Rule Tolling ................................................ 26

B.     Estoppel ................................................................................ 27

VII.   CLASS ALLEGATIONS .............................................................. 28

VIII.  CLAIMS ...................................................................................... 32

A.     Nationwide Claims ........................................................... 32

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT (15 U.S.C. § 2301, *et seq.*)..................................................... 32

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW)
(Alleged by all Plaintiff Sulligan on behalf of the Nationwide
Class) ............................................................................................... 37

COUNT III UNJUST ENRICHMENT (COMMON LAW) (Alleged by
Plaintiff Sulligan on behalf of the Nationwide Class)................................. 41

B.     State-Specific Claims ....................................................... 43

1.    Pennsylvania ........................................................... 43

COUNT IV VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 P.S. § 201-1, *et seq.*)............................................................... 43

COUNT V BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa.
Cons. Stat. Ann. § 2314) (Alleged by Plaintiff Sulligan on behalf
of the Pennsylvania Subclass) ........................................................ 47

REQUEST FOR RELIEF .......................................................................... 49

DEMAND FOR JURY TRIAL .................................................................. 50

Plaintiff files this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiff alleges the following based on personal knowledge as to her own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.    INTRODUCTION

1.    The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues. And when a car cannot be safely used by its owner while a car manufacturer is developing a fix for a safety defect, the car manufacturer should not shift the risk of a dangerous shut-down event on to the owner, but instead should provide or reimburse for comparable replacement transportation.

2.    Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Mustang Mach-E vehicles that were dangerously defective and prone to complete and partial shut-down while driving. Then, though Ford knew or should have known of the shut-down risk prior to launching the vehicles, it did nothing to promptly warn owners and lessees, instead waiting over a year after receiving numerous warranty claims exposing the defect to announce a safety recall. And while Ford now admits that the Mustang Mach-E has a serious safety defect that can cause in-operation power loss and shutdown, it has chosen *not to*

design or issue a *bona fide* fix, but rather to degrade the charging and motive

power of the Mustang Mach-E so that its defectively designed high-voltage battery

main contactors do not overheat and fail.

3.     Even though Ford has admitted that the defect is serious enough that it

will not allow its dealers to deliver *any* new Mustang Mach-E vehicles to

customers (even if they have been paid for), it has taken no steps to provide

substitute transportation or reimbursement, and is instead forcing Mustang Mach-E

owners to choose between driving an unsafe car that is prone to spontaneous

shutdown, or driving nothing—all the while remaining out of pocket for purchase

costs and/or high monthly loan, lease, and insurance payments.

4.     Model year 2021-22 Ford Mustang Mach-E vehicles manufactured

between May 27, 2020 and May 24, 2022 (the "Shutdown Defect Vehicles")[1]

contain a defect in that "[t]he design and part-to-part variation of the high voltage

---

[1] Ford has recalled all Mustang Mach-E vehicles that were produced between May 27, 2020 and May 24, 2022, and it instituted a stop-delivery order to its dealers as of June 14, 2022. Ford admits this manufacturing period covers 48,924 vehicles, which is approximately half of all Mach-E vehicles sold to date. Based upon the description of the Shutdown Defect in Ford's NHTSA submissions, there is no clear reason that the Shutdown Defect would not also affect Mach-E vehicles produced prior to May 27, 2020. Should Ford expand its recall, or should Plaintiff's counsel's further investigation so warrant, Plaintiff will amend the definition of Shutdown Defect Vehicles to contain additional manufacturing periods.

- 2 -

battery main contactor is not robust to the heat generated during DC fast charging and multiple wide open pedal events[.]"[2] (the "Shutdown Defect").

5.     The Shutdown Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle completely or partially loses power while in operation. The Shutdown Defect also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

6.     The shutdown risk is the direct result of a defect that was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Shutdown Defect to consumers both before and after their purchases of model year 2021 and 2022 Ford Mustang Mach-E, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Shutdown Defect—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Shutdown Defect Vehicle spontaneously lose power while the vehicle is in motion.

7.     Warranty claims relating to the Shutdown Defect were made to Ford as early as July 13, 2021, just seven months after the December 2020 release date

---

[2] Exhibit 1, Part 573 Safety Recall Report No. 22V-412 at p.2-3 (available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V412-9582.PDF, last accessed July 19, 2022).

of the first Mach-E models.[3] Yet Ford continued to sell Mach-Es and did nothing to warn purchasers of the Shutdown Defect until it issued its recall and stop-sale order on or about June 3, 2022.

8.      Ford has admitted that it received 286 warranty claims relating to the Shutdown Defect, just between July 13, 2021 and May 31, 2022. And it admits that 100% of the Mustang Mach-E vehicles subject to the recall have the Shutdown Defect.[4]

9.      Ford now claims to have designed a fix, but the fix Ford has proposed to resolve the dangerous Shutdown Defect—a software update—does not actually fix the defective high voltage battery contactors. Instead, based upon information Ford was required to provide to NHTSA, the "fix" will "*reduce battery power* to prevent damage to the contactor" and it will "*reduce vehicle power* to prevent further damage." Thus, instead of actually fixing the defective contactors, Ford instead downgrades the power of the battery *and vehicle power*, rendering performance something less than what Mach-E owners purchased and what Ford promoted for the Shutdown Defect Vehicles.

10.      It cannot be ignored that the Shutdown Defect Vehicles are *Ford Mustangs*. The Mustang marquis is synonymous with power and speed; Ford

---

[3] *See id.* at 9.
[4] *See id.* at 9,1.

- 4 -

promotes—and consumers purchase—these cars based on that marquis. Ford

cannot be allowed to shirk its obligation to make a *bona fide* fix of the faulty

contactors by degrading performance of these *Mustangs*, but that is exactly what it

is trying to do.

11.     A vehicle that has a risk of spontaneously shutting down while in

operation is not fit for its ordinary purpose. And a "fix" that does nothing to

*actually fix* a defect, and instead downgrades the performance of the car, is not a

fix at all. Ford is placing an unfair burden on class members who are unable to

safely operate their vehicles.

12.     Many putative class members, not wanting to bear the risk of a

dangerous shutdown, or unwilling to own a *Mustang* that has had its power

degraded, may be forced to sell their Shutdown Defect Vehicles at a loss because

of Ford's conduct and inability or unwillingness to provide a *bona fide* fix that

does not degrade vehicle performance.

13.     Ford knew or should have known about the Shutdown Defect before

the Shutdown Defect Vehicles went to market, and certainly knew well-before it

issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the

Shutdown Defect Vehicles; (2) the direct and public reports of hundreds of

warranty claims in Shutdown Defect Vehicles; and (3) Ford's own investigation of

shutdowns in the Shutdown Defect Vehicles.

- 5 -

14.     While Ford's "fix" is reducing battery power and vehicle power, it offers no reimbursement to Shutdown Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Putative class members are left without a safely operable vehicle, or with a Ford *Mustang* that no longer lives up to its name, marketing, or specifications at the time of purchase.

15.     To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Shutdown Defect Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner or other electric vehicle while storing the dangerous Shutdown Defect Vehicles until such time as it is able to repair them without degrading performance, Ford has done nothing of the sort.

16.     Because of Ford's omissions and misrepresentations regarding the Shutdown Defect and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiff and other owners and lessees of the Shutdown Defect Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiff and the putative class members known of the Shutdown Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Dealing with a possible failure of the Shutdown Defect Vehicles also

- 6 -

necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

17. Plaintiff brings this class action to redress Ford's misconduct. Plaintiff seeks damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.    JURISDICTION

18. This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiff and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

19. This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

011110-11/1967694 V1

### III.   VENUE

20.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.   Plaintiff**

**1.    Amber Sulligan (Pennsylvania)**

21.    Plaintiff and proposed class representative Amber Sulligan ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Broomall, Pennsylvania. In April 2021, Plaintiff purchased her first Mustang Mach-E. A driving force in Plaintiff's purchase was the DNA of the Mustang brand. Plaintiff expected cutting edge performance and a thrilling drive, just as Ford promised in its advertising.

22.    Plaintiff was impressed with the performance of her first Mustang Mach-E, and unaware of the Shutdown Defect, Plaintiff ordered two 2022 Mustang Mach-E vehicles for future delivery. One of these arrived in February 2022, at which time Plaintiff traded in her 2021 Mach-E and took possession of the 2022 Mach-E. Plaintiff's second 2022 Mach-E arrived in May 2022, Plaintiff picked up and drove the car on a couple of local trips, but upon receiving the recall notice, she returned it to the dealership and it has sat on their lot ever since, due to the Shutdown Defect.

- 8 -

23.     As a longtime Ford vehicle owner, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were primary reasons Plaintiff purchased the Shutdown Defect Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Defect to Plaintiff before her purchases. Plaintiff and her husband are now concerned about driving the Shutdown Defect Vehicle due to the dangers resulting from the Shutdown Defect.

24.     Since receiving notice of the recall, Plaintiff and her husband have limited their use of the Mach-E that they have, and have left the second Mach-E at the dealer. But they still have to drive the Mach-E, even with the risk of spontaneous shutdown and loss of power, because the dealer would not provide them a loaner. Plaintiff and her husband also own a 2021 Ford Expedition that has been recalled due to a serious risk of underhood fire, and for which Ford has not delivered a fix or loaner car. As a result, Plaintiff and her husband own three Ford vehicles with major safety recalls that currently have no fix, including the Shutdown Defect. Plaintiff is frustrated that she continues to make monthly

- 9 -

payments on vehicles she cannot use as intended. Plaintiff would not have purchased the vehicles had Plaintiff known about the Shutdown Defect.

25.     Plaintiff is also concerned about the supposed "fix" that Ford has indicated it will perform "over-the-air" to her car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Defect. Had Plaintiff known that the Shutdown Defect Vehicles would have their battery power and vehicle power reduced, she would not have purchased these vehicles, or she would have paid less for them.

**B.     Defendant**

26.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

27.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln brand motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

- 10 -

28.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Shutdown Defect Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Shutdown Defect Vehicles, with the intent that such documents be purposely distributed throughout all 50 states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

29.     As further detailed below, Ford authorized automobile dealerships act as Ford's agents in selling automobiles under the Ford brand name and disseminating vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.     FACTUAL ALLEGATIONS

**A.     Ford marketed the Shutdown Defect Vehicles as functional, safe, reliable, and high-performance, and knew these attributes were material to consumers.**

30.     The Shutdown Defect Vehicles are marketed to consumers as functional, safe, reliable, high-performance vehicles, and Ford knew these qualities

- 11 -

were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiff.

31.    In the sales brochure for the 2021 Ford Mustang Mach-E, Ford introduces the model as: "Infused with legendary Mustang heritage as well as its iconic design cues, Mustang Mach-E blends dynamic performance with SUV styling, plus cutting-edge connectivity and electrification to create the newest member of the Mustang family."[5]

32.    Ford also touts the high-performance attributes of the Mach-E: "With a bold, powerful presence and spirited handling, the all-new Mustang Mach-E is getting ready to charge."[6]

---

[5] *See* **Exhibit 2**, MY 2021 Ford Mustang Mach-E brochure, at 2.
[6] *See id.*



33.     Ford's 2022 brochure continues the mantra of high-performance, safety and reliability: "Ford Mustang Mach-E® delivers a driving experience like no other Mustang before it.  We're talking uninhibited exhilaration on every drive – courtesy of the all-electric drivetrain with its BREATHTAKING POWER AND TORQUE. It takes less than half a second to reach maximum torque. You also get electric power-assisted steering and a fully independent suspension, which is designed for lightweight strength, working together to channel this thrilling output to the road."[7]

---

[7] *See* **Exhibit 3**, MY 2022 Ford Mustang Mach-E brochure, at 4.



34.     Ford insists that the Mach-E lives up to its Mustang DNA[8]:

The 2022 Ford **MUSTANG MACH-E**® is redefining the shape of freedom. It's a soul-stirring SUV with undeniable Ford Mustang® DNA. The sloping fastback and sequential tri-bar turn signals. The bold shark nose front. The pushed-back A-pillar. The muscular haunches. The arresting stare. It's easy to recognize that this all-electric Pony is a member of the **LEGENDARY STABLE**.

35.     In addition to the Mach-E's high-performance, Ford also stressed the alleged safety of the vehicles, as Ford knew this was a material attribute for consumers. Promising consumers can have "confidence mile after mile" in the Mach-E, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Shutdown Defect Vehicles.[9]

---

[8] *See id.* at 2.
[9] *See id.* at 10.



36.   Ford also markets the specific safety features of the Mustang Mach-E, including "Personal Safety Systems."[10]

37.   Consumers paid a premium price for the Shutdown Defect Vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2022 Ford Mustang

---

[10] *See id.* at 13.

Mach-E starts at $44,995 for the base-level "Select" trim and goes up to $63,095 for the "GT" model.[11]

38.     Plaintiff and putative class members paid the premium prices commanded by the Shutdown Defect Vehicles because of these qualities touted by Ford, especially the long-promoted high performance associated with the Mustang brand.

**B.     Ford's Vehicle Warranties**

39.     Ford's New Vehicle Limited Warranty for the model year 2021-22 Ford Mustang Mach-E provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[12] Ford's Powertrain Warranty provides coverage for 5 years/60,000 miles, whichever comes first.[13] Specifically relevant here, "Mustang Mach-E unique electric components are covered during the Hybrid/Electric Unique Component Coverage, which lasts for 8 years or 100,000 miles (whichever comes first)."[14] On information and belief, this warranty coverage includes manufacturing defects like the Shutdown Defect in the Shutdown Defect Vehicles.

---

[11] *See* **Exhibit 4**, *2022 Ford Mustang Mach-E MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/ford/mustang-mach-e/ (last visited July 18, 2022).
[12] *See* **Exhibit 3**, MY 2022 Ford Mustang Mach-E brochure, at 16.
[13] *See id.*
[14] *See id.*

40.     Because the Shutdown Defect Vehicles are all model year 2021 or

2022 vehicles sold or leased to putative class members since the Mustang Mach-E

was released in December 2020, virtually all Shutdown Defect Vehicles—if not all

of them, including Plaintiff's vehicles—are still covered under Ford's new vehicle,

powertrain and Hybrid/Electric Unique Component Coverage warranties.

## C.    The Shutdown Defect

41.     As Ford now admits in a June 10, 2022 safety recall notification to the

National Highway Traffic Safety Administration ("NHTSA"), a defect exists in the

Shutdown Defect Vehicles that can cause them to spontaneously partially or fully

lose power while in operation.[15]

42.     Ford further admits that the Shutdown Defect Vehicles "may lose

drive power, increasing the risk of a crash."[16]

43.     Ford's recall, number 22V-412, affects 48,924 model year 2021 and

2022 Ford Mustang Mach-E vehicles built from May 27, 2020 through May 24,

2022.[17]

---

[15] *See* **Exhibit 5**, June 13, 2022 NHTSA letter to Ford,
https://static.nhtsa.gov/odi/rcl/2022/RCAK-22V412-1954.pdf (last accessed July
19, 2022).
[16] *See id.* at 1.
[17] *See* **Exhibit 1**, Part 573 Safety Recall Report at 1,
https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V412-9582.PDF (last accessed
July 19, 2022).

- 17 -

44.    Included in the 573 Report is Ford's "Description of the Cause: The design and part-to-part variation of the high voltage battery main contactor is not robust to the heat generated during DC fast charging and multiple wide open pedal events."[18]

45.    Thus, Ford admits that the defect is that the high voltage main battery contactor is defective in that it cannot handle (i) the heat generated from DC fast charging (which is a normal aspect of the intended operation of the Mustang Mach-E) and (ii) the heat generated from multiple wide open pedal events (something that the Mustang is known for and that is entirely consistent with its marketing message of a high performance vehicle).

46.    But Ford's proposed fix is wholly silent as to this admittedly defective component. It intends to leave the defective battery main high voltage contactors exactly as they are and instead apply a software change that will "reduce battery power" and "reduce vehicle power" to prevent damage to the contactor.[19]

47.    Ford also admitted that its investigation revealed 286 warranty claims related to the Shutdown Defect, beginning at least as early as July 13, 2021— nearly a year before it began notifying Shutdown Defect Vehicle owners through the recall process.[20]

---

[18] *See id*. at 1-2.
[19] *See id.* at 10.
[20] *See id.* at 9.

48.    On information and belief, Ford failed to adequately research, design, test, and manufacture the Shutdown Defect Vehicles before warranting, advertising, promoting, marketing, and selling the Shutdown Defect Vehicles as high performance, suitable and safe for use in an intended and reasonably foreseeable manner.

49.    On information and belief, Ford knew or should have known the Shutdown Defect Vehicles contained the Shutdown Defect and should have warned or disclosed this fact to Plaintiff and putative class members before selling or leasing the vehicles.

50.    Plaintiff's counsel continues to investigate whether additional manufacturing periods of the Mustang Mach-E are also plagued with the Shutdown Defect.

**D.    Ford knew or should have known of the Shutdown Defect before it disclosed the defect to Plaintiff.**

51.    On information and belief, Ford knew or should have known about the Shutdown Defect before the Shutdown Defect Vehicles went to market, and it certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Shutdown Defect Vehicles; (2) the direct warranty claims from 286 Shutdown Defect Vehicles; and (3) Ford's own investigation of shutdown events in the Shutdown Defect Vehicles.

- 19 -

1. **Ford's durability testing should have uncovered the Shutdown Defect.**

52.     Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[21]

53.     According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[22] These tests include stresses on the engines, moving parts, suspension, and electrical components.[23]

54.     Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[24] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this

---

[21] *See* **Exhibit 6**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media .ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes -how-fords-multiple-testing-facilities-p.html (last accessed June 7, 2022).
[22] *See id.*
[23] *See id.*
[24] *See id.*

- 20 -

grueling test," and, "Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[25]

55.     On information and belief, the Shutdown Defect Vehicles were put through similar durability testing or designed and built in accordance with the findings of such durability testing.

56.     Based on such durability testing, Ford should have uncovered the Shutdown Defect before the Shutdown Defect Vehicles were sold to Plaintiff and the putative class members.

**2.      Ford knew about the Shutdown Defect from warranty claims for Shutdown Defect Vehicles and its own investigation.**

57.     According to its recall chronology, Ford opened an investigation into the spontaneous shutdowns on April 12, 2022. By that time, Ford reports knowledge of *286 warranty claims*.

58.     Ford's investigation continued up until the June 2022 recall. Ford's investigation included reviews of high voltage battery contactor defects in other model lines.

59.     All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should

---

[25] *See id.*

be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Shutdown Defect Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

60.     Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Shutdown Defect Vehicles and the Shutdown Defect. At a minimum, Ford received complaints from angry owners and lessees such as Plaintiff after learning about the Shutdown Defect.

61.     However, Ford has yet to actually fix any of the faulty high voltage battery main contactors in the Shutdown Defect Vehicles. Instead, Ford has instituted an "over-the-air" software change that detunes the Shutdown Defect Vehicles into something less than what Plaintiff and other owners of Shutdown Defect Vehicles paid for and thought that they were getting. After the software update is completed, the vehicles will have reduced battery power and reduced vehicle power, all to prevent the faulty main contactor from failing. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can actually fix the problem—without degrading the performance for which Plaintiff and members of the class paid a premium.

62.     On information and belief, some owners—justified in their unwillingness to either run the risk of shutdown or detune their high-performance Mustangs—are selling or trading them in at reduced prices because of Ford's conduct.

63.     All owners and lessees of the Shutdown Defect Vehicles have suffered ascertainable loss.

**E.     There is an agency relationship between Ford and Ford dealerships.**

64.     On information and belief, the manufacturer Ford has impliedly or expressly acknowledged that Ford-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ford can control authorized Ford dealers, and Ford acts as the principal in that relationship, as is shown by the following:

    i.      Ford can terminate the relationship with its dealers at will.

    ii.     The relationships are indefinite.

    iii.    Ford is in the business of selling vehicles as are its dealers.

    iv.    Ford provides tools and resources to help Ford dealers sell vehicles.

    v.     Ford supervises its dealers regularly.

    vi.    Without Ford, the relevant Ford dealers would not exist.

    vii.   Ford requires the following of its dealers.

        1.     Reporting of sales;

        2.     Computer network connection with Ford;

3.  Training of dealers' sales and technical personnel;

4.  Use of Ford-supplied computer software;

5.  Participation in Ford's training programs;

6.  Establishment and maintenance of service departments in Ford dealerships;

7.  Certification of Ford pre-owned vehicles;

8.  Reporting to Ford with respect to the car delivery, including reporting names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.  Displaying Ford logos on signs, literature, products, and brochures within Ford dealerships.

viii.  Dealerships bind Ford with respect to:

1.  Warranty repairs on the vehicles the dealers sell; and

2.  Issuing service contracts administered by Ford.

ix.  Ford further exercises control over its dealers with respect to:

1.  Financial incentives given to Ford dealer employees;

2.  Locations of dealers;

3.  Testing and certification of dealership personnel to ensure compliance with Ford's policies and procedures; and

- 24 -

4.     Customer satisfaction surveys, pursuant to which Ford allocates the number of Ford cars to each dealer, thereby directly controlling dealership profits.

x.     Ford dealers sell Ford vehicles on Ford's behalf, pursuant to a "floor plan," and Ford does not receive payment for its cars until the dealerships sell them.

xi.    Dealerships bear Ford's brand names, use Ford's logos in advertising and on warranty repair orders, post Ford- and Lincoln-branded signs for the public to see, and enjoy a franchise to sell Ford's products, including the Shutdown Defect Vehicles.

xii.   Ford requires Ford dealers to follow the rules and policies of Ford in conducting all aspects of dealer business, including the delivery of Ford's warranties described herein, and the servicing of defective vehicles such as the Shutdown Defect Vehicles.

xiii.  Ford requires its dealers to post Ford's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ford dealers and servicing outlets for Ford cars.

xiv.   Ford requires its dealers to use service and repair forms containing Ford's brand names and logos.

xv.    Ford requires Ford dealers to perform Ford's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Ford.

xvi.   Ford requires Ford and Lincoln dealers to use parts and tools either provided by Ford, or approved by Ford, and to inform Ford when dealers discover that unauthorized parts have been installed on one of Ford's vehicles.

- 25 -

xvii.   Ford requires dealers' service and repair employees to be trained by Ford in the methods of repair of Ford and Lincoln-branded vehicles.

xviii.  Ford audits Ford dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.    Ford requires its dealers to provide Ford with monthly statements and records pertaining, in part, to dealers' sales and servicing of Ford vehicles.

xx.     Ford provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.    Ford provides its dealers with specially trained service and repair consultants with whom dealers are required by Ford to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Ford requires Ford and Lincoln vehicle owners to go to authorized Ford and Lincoln dealers to obtain servicing under Ford warranties.

xxiii.  Ford dealers are required to notify Ford whenever a car is sold or put into warranty service.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

65.     Because Ford omitted the existence of the Shutdown Defect, Class members had no way of knowing about the unreasonable shutdown risk of the Shutdown Defect Vehicles.

- 26 -

66.     Within the period of any applicable statutes of limitation, Plaintiff and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was omitting the Shutdown Defect complained of herein.

67.     Plaintiff and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable shutdown risk of the Shutdown Defect Vehicles, which was discovered by Plaintiff only shortly before this action was filed.

68.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Shutdown Defect Vehicles.

**B.     Estoppel**

69.     Ford was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the shutdown risk of the Shutdown Defect Vehicles, as well as the true character of its intended fix for the high voltage battery main contactor.

- 27 -

70.     Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of (i) the shutdown risk of the Shutdown Defect Vehicles, and (ii) the proposed fix, which will increase the charging time and decrease the vehicle performance of the Shutdown Defect Vehicles.

71.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

72.     Plaintiff brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased model year 2021 or 2022 Ford Mustang Mach-E vehicle that was included in Part 573 Safety Recall Report No. 22V-412 (the "Shutdown Defect Vehicles").

> **Pennsylvania Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Defect Vehicles in the State of Pennsylvania.

73.     Plaintiff asserts claims under the laws of each state set forth below.

74.     Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from any incident caused by the Shutdown Defect Vehicles. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to

- 28 -

be excluded from this action; governmental entities; the Judge to whom this case is

assigned and his/her immediate family; and Plaintiff's Counsel. Plaintiff reserves

the right to revise the Class and Subclass definitions based upon information

learned through discovery.

75.     Certification of Plaintiff's claims for class-wide treatment is

appropriate because Plaintiff can prove the elements of her claims on a class-wide

basis using the same evidence as would be used to prove those elements in

individual actions alleging the same claim.

76.     This action has been brought and may be properly maintained on

behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil

Procedure 23.

77.     **<u>Numerosity</u>**. Federal Rule of Civil Procedure 23(a)(1): The members

of each Class and Subclass are so numerous and geographically dispersed that

individual joinder of all Class members is impracticable. For purposes of this

complaint, Plaintiff alleges that there are estimated to be at least 48,924 or more

Shutdown Defect Vehicles in the Nationwide Class. The precise number of Class

and Subclass members is unknown to Plaintiff but may be ascertained from Ford's

books and records. Class and Subclass members may be notified of the pendency

of this action by recognized, Court-approved notice dissemination methods, which

may include U.S. Mail, electronic mail, internet postings, and published notice.

- 29 -

78.    **Commonality and Predominance**: Federal Rule of Civil Procedure

23(a)(2) and 23(b)(3): This action involves common questions of law and fact,

which predominate over any questions affecting individual Class and Subclass

members, including, without limitation:

a.    Whether Ford engaged in the conduct alleged herein;

b.    Whether the Shutdown Defect creates an unreasonable risk of
complete or partial power loss in the Shutdown Defect
Vehicles;

c.    When Ford first knew about the Shutdown Defect;

d.    Whether Ford designed, manufactured, marketed, and
distributed the Shutdown Defect Vehicles with defective
component(s) that cause the Shutdown Defect;

e.    Whether Ford's conduct renders it liable for breach of the
implied warranty of merchantability;

f.    Whether Ford has been unjustly enriched at the expense of
Plaintiff and the Class and Subclasses;

g.    Whether Plaintiff and the other Class and Subclass members
overpaid for their vehicles at the point of sale; and

h.    Whether Plaintiff and the other Class and Subclass members are
entitled to damages and other monetary relief and, if so, in what
amount.

79.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's

claims are typical of the other Class and Subclass members' claims because,

among other things, all Class and Subclass members were comparably injured

through Ford's wrongful conduct as described above.

80.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class and Subclass representative because her interests do not conflict with the interests of the other members of the Class and Subclasses she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiff and her counsel.

81.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management

- 31 -

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.    Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)

**(Alleged by Plaintiff Sulligan on behalf of the Nationwide Class)**

82.    Plaintiff Sulligan re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

83.    Plaintiff Sulligan brings this claim on behalf of the Nationwide Class.

84.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

85.    The Shutdown Defect Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff Sulligan and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

86.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

- 32 -

87.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

88.     Ford provided Plaintiff Sulligan and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Shutdown Defect Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

89.     Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiff Sulligan under 15 U.S.C. § 2310(d)(1). Without limitation, the Shutdown Defect Vehicles share a common defect in that they are all equipped with a defect in the high voltage battery main contactor that makes the vehicles susceptible to a risk of partial or complete shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Defect Vehicles. The Shutdown Defect rendered the Shutdown Defect Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

90.    As discussed herein, on information and belief, Ford knew or should have known about the Shutdown Defect from its own durability testing of the Shutdown Defect Vehicles before launching the Shutdown Defect Vehicles. Ford omitted information about the Defect and its consequences from Plaintiff Sulligan and Class members, misrepresented the qualities of the Shutdown Defect Vehicles, and has failed to provide a *bona fide* fix for the Shutdown Defect. Instead, Ford has instituted a software update that will depower the battery and motive power of Shutdown Defect Vehicles, potentially slowing down charging time and degrading the power and performance of the Mustang Mach-E that Ford advertised and promoted, and that Plaintiff Sulligan and the Class members thought they would have for the duration of their ownership.

91.    Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Shutdown Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

92.    Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiff Sulligan, because, at the time of purchase and lease, Plaintiff Sulligan had no other options for purchasing warranty coverage other than directly from Ford.

- 34 -

93.     Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Shutdown Defect Vehicles were defective and that the Shutdown Defect Vehicles could spontaneously lose power when used as intended long before Plaintiff Sulligan and the Class. Ford failed to disclose this defect to Plaintiff Sulligan and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

94.     Plaintiff Sulligan has had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiff Sulligan. Nonetheless, privity is not required here because Plaintiff Sulligan is an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Shutdown Defect Vehicles and have no rights under the warranty agreements provided with the Shutdown Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Shutdown Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous shutdown presents an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Defect Vehicles.

- 35 -

95.   Under 15 U.S.C. § 2310(e), Plaintiff Sulligan is entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff Sulligan under Rule 23 of the Federal Rules of Civil Procedure.

96.   Plaintiff Sulligan would suffer economic hardship if she returned her Shutdown Defect Vehicles but did not receive the return of all payments made by her. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiff Sulligan has not re-accepted her Shutdown Defect Vehicles by retaining them.

97.   The amount in controversy of Plaintiff Sulligan's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiff Sulligan, individually and on behalf of all other Nationwide Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiff Sulligan is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff Sulligan and the Nationwide Class members in connection with the commencement and prosecution of this action.

98.    Plaintiff Sulligan also seeks the establishment of a Ford-funded program for Plaintiff Sulligan and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Shutdown Defect in their Shutdown Defect Vehicles.

## COUNT II

### FRAUDULENT CONCEALMENT
### (COMMON LAW)
### (Alleged by all Plaintiff Sulligan on behalf of the Nationwide Class)

99.    Plaintiff Sulligan realleges and incorporate by reference all paragraphs as though fully set forth herein.

100.    Plaintiff Sulligan asserts this claim on behalf of herself and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclass.

101.    A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Shutdown Defect Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Shutdown Defect Vehicles, or (b) knowingly concealed material information in connection with the sale or lease of the Shutdown Defect Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Shutdown Defect

- 37 -

Vehicles; and (iii) as a result of Ford's conduct, Plaintiff Sulligan suffered economic damages.

102.   Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiff Sulligan's vehicles.

103.   Ford sold the Shutdown Defect Vehicles to Plaintiff Sulligan without disclosing the Shutdown Defect and concealed and suppressed the defect from regulators and consumers.

104.   Ford concealed and suppressed the Shutdown Defect with the intent to deceive Plaintiff Sulligan.

105.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Shutdown Defect Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Mustang brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety and performance of the Shutdown Defect Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

106.   Ford had a duty to disclose the Shutdown Defect because it was known and/ only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable

- 38 -

by, Plaintiff Sulligan. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance and quality of the Shutdown Defect Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Shutdown Defect. Having provided information to Plaintiff Sulligan, Ford had the duty to disclose not just the partial truth, but the entire truth. Finally, once the Shutdown Defect Vehicles were on the road, Ford had a duty to monitor the Shutdown Defect Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

107.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff Sulligan and the Nationwide Class.

108.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff Sulligan and the Nationwide Class and conceal material information regarding the Shutdown Defect. This is especially true in the context of Ford's purported "fix," which does not actually fix the defective high voltage main battery connector but appears instead designed to intentionally slow down charging and reduce engine power in order to prevent the Shutdown Defect from manifesting.

109.    Plaintiff Sulligan was unaware of these omitted material facts and would not have acted as she did if she had known of the concealed and/or suppressed facts, in that they would not have purchased her Shutdown Defect Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated as high performance electric vehicles worthy of the Mustang brand. Plaintiff Sulligan's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff Sulligan.

110.    Because of the concealment and/or suppression of the facts, Plaintiff Sulligan sustained damage. In purchasing or leasing her Shutdown Defect Vehicles, Plaintiff Sulligan did not get the benefit of her bargain since the vehicles were worth less than they would have been without the defects, and because she owns vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defects. Those Nationwide Class members who sold their dangerous Shutdown Defect Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff Sulligan been aware of the concealed defects that existed in the Shutdown Defect Vehicles, Plaintiff Sulligan would have paid less for her vehicles or would not have purchased or leased them at all.

111.   Accordingly, Ford is liable to Plaintiff Sulligan and the Nationwide Class for damages in an amount to be proven at trial.

112.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Sulligan's rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### UNJUST ENRICHMENT
### (COMMON LAW)
### (Alleged by Plaintiff Sulligan on behalf of the Nationwide Class)

113.   Plaintiff Sulligan realleges and incorporates by reference all paragraphs as though fully set forth herein.

114.   Plaintiff Sulligan asserts this claim on behalf of herself and the Nationwide Class, or, in the alternative, on behalf of the state-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

115.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff Sulligan and the Nationwide Class.

116.   Ford has received and retained a benefit from Plaintiff Sulligan and Nationwide Class members and inequity has resulted.

117.   Ford has benefitted from selling, leasing, and distributing the Shutdown Defect Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiff Sulligan and Nationwide Class members have overpaid for the Shutdown Defect Vehicles and been forced to pay other costs.

118.   Thus, Plaintiff Sulligan and the Nationwide Class conferred a benefit on Ford.

119.   It is inequitable for Ford to retain these benefits.

120.   Plaintiff Sulligan and the Nationwide Class were not aware of the true facts about the Shutdown Defect Vehicles and did not benefit from Ford's conduct described herein.

121.   Ford knowingly accepted the benefits of its unjust conduct.

122.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

011110-11/1967694 V1

**B.     State-Specific Claims**

**1.     Pennsylvania**

## COUNT IV

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
## (73 P.S. § 201-1, *et seq.*)

**(Alleged by Plaintiff Sulligan on behalf of the Pennsylvania Subclass)**

123.   Plaintiff Sulligan and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

124.   Plaintiff Sulligan brings this action on behalf of herself and the Pennsylvania Subclass.

125.   Plaintiff Sulligan and the Pennsylvania Subclass members purchased or leased their Shutdown Defect Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

126.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

127.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv)

- 43 -

"Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

128.   Ford engaged in unlawful trade practices, including representing that the Shutdown Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Shutdown Defect Vehicles are of a particular standard and quality when they are not; advertising the Shutdown Defect Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

129.   In purchasing or leasing the Shutdown Defect Vehicles, Plaintiff Sulligan and the Pennsylvania Subclass were deceived by Ford's failure to disclose the Shutdown Defect and misrepresentations about the Shutdown Defect Vehicles.

130.   Plaintiff Sulligan and the Pennsylvania Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff Sulligan and the Pennsylvania Subclass members did not, and could not, unravel Ford's deception on their own.

131.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Sulligan and the Pennsylvania Subclass members.

- 44 -

132.    Ford knew or should have known that its conduct violated the Pennsylvania CPL.

133.    Ford knew or should have known about the Shutdown Defect affecting the Shutdown Defect Vehicles owned or leased by Plaintiff Sulligan and the Pennsylvania Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Defect Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Defect Vehicles.

134.    Ford owed Plaintiff Sulligan and the Pennsylvania Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Defect Vehicles because Ford:

  a. Possessed exclusive knowledge about the Shutdown Defect;

  b. Omitted the foregoing from Plaintiff Sulligan and the Pennsylvania Subclass;

  c. Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Defect Vehicles, while withholding material facts from Plaintiff Sulligan and the Pennsylvania Subclass that contradicted these representations; and/or

  d. Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Defect.

135.    Ford had a duty to disclose the Shutdown Defect, because, having volunteered to provide information to Plaintiff Sulligan and the Pennsylvania Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the

Shutdown Defect Vehicles they were purchasing safe and free from serious safety defects.

136.   Plaintiff Sulligan and the Pennsylvania Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Shutdown Defect Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Sulligan and the Pennsylvania Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Sulligan and the Pennsylvania Subclass.

137.   Ford's violations of the Pennsylvania CPL present a continuing risk to Plaintiff Sulligan, the Pennsylvania Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Defect Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

138.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff

- 46 -

Sulligan and the Pennsylvania Subclass. Had Plaintiff Sulligan and the

Pennsylvania Subclass members known the truth about the Shutdown Defect

and/or Ford's proposed fix, which will degrade the performance of their Mustangs,

they would not have purchased or leased the vehicles or would have paid

significantly less for them. Plaintiff Sulligan and the Pennsylvania Subclass also

suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of

use, and lost value related to the Shutdown Defect Vehicles.

139. Ford is liable to Plaintiff Sulligan and the Pennsylvania Subclass for

treble their actual damages or $100, whichever is greater, and attorneys' fees and

costs. 73 P.S. § 201-9.2(a).

## COUNT V

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER PENNSYLVANIA LAW
### (13 Pa. Cons. Stat. Ann. § 2314)
### (Alleged by Plaintiff Sulligan on behalf of the Pennsylvania Subclass)

140. Plaintiff Sulligan and the Pennsylvania Subclass reallege and

incorporate by reference all paragraphs as though fully set forth herein.

141. Plaintiff Sulligan brings this action on behalf of herself and the

Pennsylvania Subclass.

142. Ford is a "merchant" with respect to motor vehicles.

143. Under Pennsylvania law, an implied warranty of merchantability

attaches to the Shutdown Defect Vehicles.

144.    The Shutdown Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Defect described herein. Without limitation, the Shutdown Defect Vehicles share a common defect in that they are all equipped with the same high voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Defect Vehicles. The Shutdown Defect renders the Shutdown Defect Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

145.    Plaintiff Sulligan and the Pennsylvania Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Defect Vehicles to Plaintiff Sulligan and the Pennsylvania Subclass members.

146.    It was reasonable to expect that Plaintiff Sulligan and the Pennsylvania Subclass members would use, consume, or be affected by the Shutdown Defect Vehicles.

147.    Ford was provided notice of these issues within a reasonable time of Plaintiff Sulligan and the Pennsylvania Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Defect Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Defect that is the

- 48 -

subject of this Complaint, and by the allegations contained in this and earlier Complaints.

148. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Sulligan and the Pennsylvania Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class and Subclasses, respectfully requests that the Court enter judgment in her favor and against Ford, as follows:

A.    Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiff's counsel as Class Counsel;

B.    Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Shutdown Defect Vehicles, or the overpayment for their vehicles;

C.    Damages, costs, and disgorgement in an amount to be determined at trial;

D.    An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

011110-11/1967694 V1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial for all claims so triable.

DATED: July 20, 2022

Respectfully Submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiff*

011110-11/1967694 V1