UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER SULLIGAN *et al.*,

       Plaintiffs,

v.
                           Civil Case No. 22-11668
                           Honorable Linda V. Parker

FORD MOTOR COMPANY,

       Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND STRIKE CLASS ALLEGATIONS  (ECF NO. 17)

       This is a putative class action initiated on July 20, 2022, involving the recall of certain 2021 to 2022 Ford Mustang Mach-E vehicles.  Plaintiffs—currently nine named individuals from seven states—who represent a nationwide class and subclasses, bring this lawsuit against Ford Motor Company ("Ford") alleging a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. ("MMWA") (Count 1), fraudulent concealment (Count 2), unjust enrichment (Count 3), and numerous state-specific claims involving fraud and consumer protection laws (Counts 4–19).  The matter is presently before the Court on Ford's Motion to Dismiss Plaintiff's First Amended Complaint and to Strike Class

Allegations.  (ECF No. 17.)  The motion is fully briefed.  (ECF Nos. 19, 20.)

Finding the facts and legal arguments sufficiently presented by the parties, the

Court is dispensing with oral argument with respect to Ford's motion pursuant to

Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the

Court is granting in part and denying in part Ford's motion.

## I.  Statement of Facts

Plaintiffs residing in California, Georgia, Indiana, Maine, Nevada, North

Carolina, and Pennsylvania allege that model year 2021–2022 Ford Mustang

Mach-E vehicles built from May 27, 2020, through May 24, 2022, created an

"unreasonable risk of accident, injury, death, or property damage if their vehicle

completely or partially loses power while in operation," as a result of a finding by

Ford that "[t]he design and part-to-part variation of the high voltage battery main

contactor is not robust to the heat generated during DC fast charging and multiple

wide open pedal events[.]"  (ECF No. 15 ¶¶ 4–5, Pg ID 158–59.)  Plaintiffs refer to

this defect as the "Shutdown Risk." (*Id.*)

On April 12, 2022, Ford's Critical Concern Review Group opened an

investigation into the Shutdown Risk based on warranty claims involving "an issue

pertaining to [the] high voltage battery main contactor overheating."  (ECF No 15

¶ 101, Pg ID 196; ECF No. 15-2 at Pg ID 288.)  Between July 13, 2021 and May

31, 2022, 286 warranty claims were made in North America regarding the

Shutdown Risk.  (ECF No. 15 ¶ 8, Pg ID 160; Ex. 1, ECF No. 15-2 at Pg ID 288.)

On or about June 3, 2022, Ford issued a "stop-sale order" approved by its Field

Review Committee.  (ECF No. 15 ¶ 7, Pg ID 160.)  The National Highway Traffic

Safety Administration ("NHTSA") issued a report, which included a recall by Ford

on June 21, 2022, identifying approximately 48,924 vehicles affected by the

Shutdown Risk.  The report describes the defect and cause as follows:

> **Description of the Defect:** Direct Current ("DC") fast charging and repeated wide open pedal events can cause the high voltage battery main contactors to overheat. Overheating may lead to arcing and deformation of the electrical contact surfaces, which can result in a contactor that remains open or a contactor that welds closed.
>
> ---
>
> **Description of the Cause:** The design and part-to-part variation of the high voltage battery main contactor is not robust to the heat generated during DC fast charging and multiple wide open pedal events

(ECF No. 15-2 at Pg ID 280–81.)  In order to remedy the Shutdown Risk,  and at

no cost to the owners of the affected vehicles, Ford stated the following:

> The remedy for this program is a Secondary On-Board Diagnostic Control Module (SOBDMC) and Battery Energy Control Module (BECM) software update. Ford is anticipated to begin Over-The-Air (OTA) deployment to update the SOBDMC an BECM software for affected vehicles in July 2022. Alternatively, owners will have the option to take their vehicle to a Ford or Lincoln dealer to complete the software update. There will be no charge for this service.

3

(*Id.* at Pg ID 289.)  In addition to the software update, Ford provided that there would be a "general reimbursement plan for the cost of remedies paid for by vehicle owners prior to notification of the safety recall in May 2021," which would continue through January 31, 2023.  (*Id.*)  No Plaintiffs have alleged any physical injury, death, or property damage.  However, four Plaintiffs experienced a shutdown of their vehicle: Thomas Dorobiala, Melissa Orlando, Blair Myers, and Matthew Rothwell.

Plaintiff Thomas Dorobiala purchased his 2022 Mustang Mach-E from Gosch Ford Temecula in Temecula, California on February 18, 2022.  On February 22, 2022, Mr. Dorobiala was driving his vehicle home from the dealership after receiving the Energy Control Module Software Update when his warning lights came on.  Mr. Dorobiala lost control of the affected vehicle and went into a ditch.  However, he was eventually able to drive the affected vehicle back to the dealership for repairs.

Plaintiff Melissa Orlando purchased a new 2022 Mustang Mach-E from Hemborg Ford in Norco, California on May 31, 2022.  In July 2022, Ms. Orlando was driving her vehicle on the freeway when it suddenly shut down.  Although she did not have access to a shoulder on the freeway to pull over, Ms. Orlando was able to drive to an exit once the vehicle regained power.  Ms. Orlando

subsequently took her affected vehicle to the dealership in for a fix due to the recall.

Plaintiff Blair Myers purchased a new 2021 Mustang Mach-E from Five Star Ford in Warner Robins, Georgia on June 14, 2021.  On June 8, 2022, almost  a year later, Mr. Myers drove his dog to the groomer, which is less than five miles from his home.  Once he pulled into the parking lot, the vehicle shut down. The dashboard began displaying warning messages, including that "the power would be limited and the car needed service," and for the remainder of Mr. Myers errands, the car drove "differently."  (ECF No. 15 ¶ 47, Pg ID 175.)  After contacting the dealership, Mr. Myers was unable to get any assistance due to the Manager being allegedly unaware of how to remedy the issue.  According to the Amended Complaint, it is unclear as to whether Mr. Myers ever received the new software update.

Plaintiff Matthew Rothwell purchased a new 2022 Mustang Mach-E from Key Ford of York in York, Maine on August 2, 2021.  On April 15, 2022, Mr. Rothwell's vehicle shut down while he and his wife were on a road trip from Maine to Florida.  Although they recently charged the vehicle in Connecticut, while at a stoplight attempting to enter the highway, the vehicle shut down and the warning lights began to flash.  According to Plaintiffs, they were still able to "coast into a nearby parking lot" and wait on a tow truck to arrive.  (ECF No 15 ¶ 57, Pg

ID 179.)  Eventually, Plaintiff Rothwell was able to get the vehicle to the

dealership and get the hardware fixed.  On July 6, 2022, Plaintiff Rothwell

downloaded the software update but still reported experiencing some issues,

including warning lights and a decrease in power.

## II.  Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of

the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134

(6th Cir. 1996).  To survive a motion to dismiss, a complaint need not contain

"detailed factual allegations," but it must contain more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action . . .."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint does not

"suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Twombly*,

550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).

"Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, 864 F.3d 455, 458 (6th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678.)  Moreover, the plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  This presumption is not applicable to legal conclusions, however.  *Iqbal*, 556 U.S. at 668.

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss.  *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)).  A court that considers such matters must first convert the motion to dismiss to one for summary judgment.  *See* FED. R. CIV. P 12(d).  However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims

contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430

(6th Cir. 2008).

## III.  Analysis

In its motion to dismiss, Ford seeks an order from the Court granting the

following:

(1)  Dismissing the entire [First Amended Complaint] on mootness grounds given that Ford has recalled the vehicles that are the subject of the complaint

(2)  Dismissing Counts 5, 8, 11, 13, 15, 17, and 19 for failure to allege facts sufficient to state a claim for breach of the implied warranty of merchantability under Pennsylvania, California, Georgia, Indiana, Maine, Nevada, and North Carolina laws, respectively;

(3)  Dismissing Count 1 for failure to allege facts sufficient to state a claim for violation of the Magnuson-Moss Warranty Act;

(4)  Dismissing Counts 2, 4, 6, 7, 9, 10, 12, 14, 16, 18 for failure to allege facts sufficient to state a claim for common law fraudulent concealment and breach of the respective consumer protection statutes;

(5)  Dismissing Count 3 for failure to allege facts sufficient to state a claim for unjust enrichment; and

(6)  Dismissing or striking the nationwide class allegations in Counts 1, 2, and 3, and striking the class allegations in Count 9.

(ECF No. 17 at Pg ID 487.)

## A. <u>Standing for Nationwide Class Claims</u>

As a threshold issue, Ford maintains that the Court should strike Plaintiffs'

nationwide claims—violations of the Magnuson-Moss Warranty Act (Count 1),

fraudulent concealment (Count 2), and unjust enrichment (Count 3)—because

Plaintiffs lack standing to plead such claims only alleging individual state laws. Although the Sixth Circuit has yet to opine on the matter, courts in this district have held that the issue of standing is "logical[ly] antecedent" to class certification, and as such, "permits consideration of the standing issue ... prior to class certification." *Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *1 (E.D. Mich. Jan. 4, 2019); *Flores v. FCA US LLC*, 2021 WL 1122216, at **25–26 (E.D. Mich. 2021) ("This 'logically antecedent' language should be construed in a manner that permits consideration of the standing issue prior to class certification.").  As courts have determined, "[n]amed plaintiffs who represent a class must allege and show that they personally have been injured not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Ambrose v. Gen. Motors LLC*, No. 19-13449, 2022 WL 3701946, at *8 (E.D. Mich. Aug. 26, 2022) (discussing *Flores*, 2021 WL 1122216, at *25) (internal quotations omitted); *see also Smith v. Laws. Title Ins. Corp.*, No. 07-12124, 2009 WL 514210, at *3 (E.D. Mich. Mar. 2, 2009) (deciding that because "the plaintiff has not alleged injury in any other state" the plaintiff lacked "standing to bring state law claims arising under the laws" of other states); *Wozniak*, 2019 WL 108845, at *1 (determining that the named plaintiffs failed to allege injury in twenty-three states and dismissing the claims for lack of standing).

9

Similar to the cases cited above, the named Plaintiffs in this matter seek to represent a nationwide class but fail, at a minimum, to allege a viable warranty, fraudulent concealment, and unjust enrichment claim under the laws of all fifty states. Thus, the state-specific Plaintiffs lack standing to bring such claims on behalf of a broader nationwide class, and as such, Counts 1, 2, and 3 must be dismissed.

## B. **Prudential Mootness**

Ford maintains that all of Plaintiffs' claims are moot under the doctrine of 'prudential mootness' because Ford issued a recall for the affected vehicles. The doctrine of mootness is a corollary to the "cases" and "controversies" requirement of Article III. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990); *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974). As now Justice Neil Gorsuch described prudential mootness while sitting as a circuit judge:

> Always the doctrine describes a situation where events in the world have so overtaken a lawsuit that deciding it involves more energy than effect, a waste of effort on questions now more pedantic than practical. In some cases mootness bears a constitutional countenance, acting as a jurisdictional bar against even entertaining a case. Other times mootness carries a more prudential complexion, permitting us to withhold relief we have the authority to grant. Other times still, a case finds itself mooted by a tangle of constitutional and prudential considerations.

10

*Winzler v. Toyota Motor Sales USA*, Inc., 681 F.3d 1208, 1209 (10th Cir. 2012).

The present case, like *Winzler*, invokes the doctrine of prudential mootness.

A majority of Circuits, including the Sixth, have adopted the doctrine of prudential mootness.  *See F.D.I.C. v. Kooyomjian*, 220 F.3d 10, 14–15 (1st Cir. 2000); *Sierra Club v. U.S. Army Corps of Engineers*, 277  F. App'x 170, 172–73 (3d Cir. May 14, 2008); *United States v. (Under Seal)*, 757 F.2d 600, 603 (4th Cir. 1985); *281–300 Joint Venture v. Onion,* 938 F.2d 35, 38 (5th Cir.1991); *Greenbaum v. U.S.E. P.A.*, 370 F.3d 527, 534–35 (6th Cir. 2004); *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005); *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 744 F.3d 1124, 1137 (9th Cir. 2014); *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991).  The doctrine is discretionary, allowing a court to withhold its authority to provide relief in the face of "circumstances under which [the] controversy, not constitutionally moot, is so 'attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand." *Nasoordeen v. F.D.I.C.*, No. CV 08-05631 MMM (AJWx), 2010 WL 1135888, at *6 (C.D. Cal. Mar. 17, 2010) (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)) (additional citations omitted); *see also Deutsche Bank Nat'l Trust Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014) (quoting *Hunt v. Imperial Merch. Servs. Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009)) (explaining that the

doctrine "permits a court to dismiss [a lawsuit] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief"). "[I]f events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal." *Winzler*, 681 F.3d at 1210. The party asserting mootness has the burden to establish that there is no effective relief the court can provide. *See id.*

The "[p]rudential mootness doctrine often makes its appearance in cases where a plaintiff starts off with a vital complaint but then a coordinate branch of government steps in to promise the relief [the plaintiff] seeks." *Id.* As the Tenth Circuit reasoned in *Winzler*:

> [O]nce the plaintiff has a remedial promise from a coordinate branch in hand, [courts] will generally decline to add the promise of a judicial remedy to the heap. While deciding the lawsuit might once have had practical importance, given the assurance of relief from some other department of government it doesn't any longer.

*Id.* "[R]emedial commitments of the coordinate branches of the United States government bear special gravity." *Id.* at 1211 (citations omitted). They are taken seriously "because they are generally trustworthy" and "because affording a judicial remedy on top of one already promised by a coordinate branch risks needless inter-branch disputes over the execution of the remedial process and the duplicative expenditure of finite public resources." *Id.*

12

Here, Plaintiffs seek damages "for losses suffered at the point of purchase and where Ford's purported fix does not actually fix the inadequate high-voltage battery contractors."  (ECF No. 19 at Pg ID 1071.)  Courts are clear about the parameters of the prudential mootness doctrine related to automobile defects subject to a recall.  "By filing documents with NHTSA notifying it of a defect, [Ford] set into motion the great grinding gears of a statutorily mandated and administratively overseen national recall process." *Winzler*, 681 F.3d at 1211; *see also Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 379 (6th Cir. 2015) (finding case moot when "[t]here was never a dispute between the parties as to whether a safety defect exist[ed] in the vehicles or whether [the defendant] would repair that defect . . . as [the defendant] acknowledged the safety defect in the recall notice and promised to repair it, for free, 'as quickly as possible'"); *Cheng v. BMW of NA, LLC*, No. CV-12-09262, 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (emphasis in original) (finding *Winzler* "highly analogous," as the "[p]laintiff filed th[e] lawsuit . . . just days after BMW announced a recall of [the defective vehicles]—following a lengthy and cooperative investigation with NHTSA"). Even without a commitment from a coordinate branch of government, the court in *Flores v. FCA US, LLC*, No. 19-cv-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020), found the case prudentially moot where FCA, independent of a statutorily mandated recall, promised to repair the defective vehicles, had repaired

13

vehicles presented for repair, and reimbursed owners who submitted valid repair receipts.  *Id.* at *4.  The facts before the Court are "highly analogous" to these cases.

Plaintiffs initiated this lawsuit barely a month after Ford, working with the NHTSA, issued its recall after a lengthy investigation into the Shutdown Risk.  Not only did Ford provide a downloadable software update to correct the problem, but Ford also gave affected customers the option to bring the vehicles into the dealership to install the update, along with providing full reimbursement for any prior out-of-pocket expenses.  Plaintiffs do not dispute that Ford recalled its vehicles or that Ford issued a remedy; in fact, Plaintiffs concede these facts.  However, despite these remedies, Plaintiffs' primary argument appears to be that Fords software update is not a "*bona fide* fix" because it " does not actually fix the inadequate high-voltage battery contactors" but instead "will *reduce battery power* to prevent damage to the contactor and it will *reduce vehicle power* to prevent further damage."  (ECF No. 15 ¶ 9–10, Pg ID 160–61.)   The fact that this inquiry and alleged harm does not end with a simple recall but plausible allegations of a reduction in battery power and vehicle performance as a result of the proposed fix, Plaintiffs have sufficiently pleaded facts to demonstrate that their claims are not prudentially moot.  A determination as to whether Ford's proposed remedy actually fixed the defect, with the facts alleged, is a determination that should be

14

left to a jury. *See Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 648 (E.D. Mich. 2021) (Tarnow, J.) ("Plaintiffs need not prove the ineffectiveness of Defendant's repair effort at [the motion to dismiss stage], because the question of whether Defendant's repair effectively cured the Death Wobble is deeply entwined with the merits of Plaintiffs' federal and state claims").

### C. <u>Implied Warranty of Merchantability</u>

Ford seeks to dismiss Plaintiffs' state law claims of implied warranty of merchantability under the laws of Pennsylvania (Count 5), California (Count 8), Georgia (Count 11), Indiana (Count 13), Maine (Count 15), Nevada (Count 17), and North Carolina (Count 19).

### 1. *Fitness For an Ordinary Purpose*

First, Ford maintains that Plaintiff's claims should be dismissed because their vehicles are all operational, proving that they are "fit for [their] ordinary purpose" under the state's perspective laws, and thus Ford is not in violation of the implied warranty or merchantability.  (ECF No. 17 at Pg ID 512 (citing U.C.C. § 2-314; Ga. Code § 11-2-314; Cal. Civ. Code § 1791.1a; Nev. Rev. Stat. § 104.2314(2)(c); 13 Pa. Cons. Stat. Ann. § 2314; Ind. Code § 26-1-2-314; Me. Rev. Stat. Ann. tit. § 2-314; N.C. Gen. Stat. § 25-2-31).)  The elements for an implied warranty of merchantability claim for each state is listed below:

15

- *Pennsylvania – 13 Pa. Cons. Stat. § 2314* (Count 5)

Under Pennsylvania law, "[t]o prove a breach of the warranty of merchantability, a plaintiff must show that the equipment obtained from the supplier was defective." *Visual Communications, Inc. v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 611 F.Supp.2d 465, 470 (E.D. Pa. 2009). "This requires showing (1) that the product malfunctioned; (2) that the plaintiff used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." *Id.* (citation omitted) "[C]ontract claims for breach of the implied warranty of merchantability and fitness for a particular purpose may also fall within the sphere of products liability actions." *Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 357 (Pa. Super 2015). "In cases involving a breach of the implied warranty of merchantability, any party injured by the defective product may sue any party in the distributive chain." *Id.* "Implied warranties are implied by law to protect buyers from loss where goods purchased are below commercial standards." *Id.* The concept of merchantability requires that the goods "are free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Id.* (quoting *Gall by Gall v. Allegheny Cnty. Health Dep't*, 555 A.2d 786, 789 (Pa. 1989).

- *California – Song–Beverly Consumer Warranty Act*
*Cal. Civ. Code §§ 1791.1 & 1792* (Count 8)

"Under the Song–Beverly Act, there is an implied warranty of merchantability with respect to consumer goods that are sold (Cal. Civ. Code, § 1792), unless the goods are sold with an express disclaimer stating they are sold 'as is' or 'with all faults.' " *Jones v. Credit Auto Ctr., Inc.*, 188 Cal.Rptr.3d 578, 583 (Cal. App. Dep't Super. Ct. 2015) (citing Cal. Civ. Code § 1791.3). "The Song–Beverly Act's implied warranty of merchantability applies to new goods (Cal. Civ. Code § 1791(a)), and also used goods, so long as the used goods are purchased 'in a sale in which an express warranty is given.' " *Id.* (quoting Cal. Civ. Code § 1795.5). "Pursuant to Civil Code section 1791.1, subdivision (a), the implied warranty of merchantability requires 'that the goods meet each of the following: (1) Pass without objection in the trade under the contract description. (2) Are fit for the ordinary purposes for which such goods are used. (3) Are adequately contained, packaged, and labeled. (4) Conform to the promises or affirmations of fact made on the container or label.' " *Id.* "The core test of merchantability is fitness for the ordinary purpose for which such goods are used." *Id.*

- *Georgia – Ga. Code Ann. § 11-2-314(1)* (Count 11)

"Under Georgia law, the implied warranty of merchantability is implied in contracts of sale when the seller is a merchant with respect to goods of that kind."

*Elder v. Reliance Worldwide Corp.*, 563 F. Supp. 3d 1221, 1238 (N.D. Ga. 2021)

(quoting Ga. Code Ann. § 11-2-314(1)).  "This warranty protects consumers from

defects or conditions existing at the time of sale."  *Soto v. CarMax Auto*

*Superstores, Inc.*, 611 S.E.2d 108, 109 (Ga. Ct. App. 2005) (citing Ga. Code Ann.

§ 11–2–314(1)) (internal quotations omitted).  Once the product in question

"leaves the retailer's control in a condition which does not conform to the

representations of the warranty of merchantability, such defective condition

constitutes evidence of a breach of warranty, which creates a jury question."

*McDonald v. Mazda Motors of Am., Inc.*, 603 S.E.2d 456, 462 (Ga. Ct. App. 2004)

(citing *Fender v. Colonial Stores*, 225 S.E.2d 691, 693 (Ga. Ct. App. 1976)).  "To

be considered 'merchantable,' a product must be 'fit for the ordinary purposes for

which such goods are used.' "  *Elder*, 563 F. Supp. 3d at 1238 (quoting Ga. Code

Ann. § 11-2-314(2)(c)).

- *Indiana – Ind. Code. § 26-1-2-314* (Count 13)

Under Indiana law, the implied warranty of merchantability "provides that a

warranty that goods shall be merchantable is implied in a contract for their sale if

the seller is a merchant with respect to goods of that kind."  *Irmscher Suppliers,*

*Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009) (citing Ind. Code §

26–1–2–314(1)).  "Additionally, subsection (2) requires that, for the goods to be

merchantable, they must at least be such as are fit for the ordinary purposes for

18

which such goods are used." *Id.*  The "implied warranty of merchantability is imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer." *Frantz v. Cantrell*, 711 N.E.2d 856, 859 (Ind. Ct. App. 1999).  Other than sellers who are merchants, Indiana law provides that "a consumer may sue a manufacturer for economic loss based on breach of the implied warranty of merchantability even if the consumer purchased the product from an intermediary in the distribution chain." *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 948 (Ind. 2005).  A product is deemed to be ' merchantable' if the goods sold will conform to ordinary standards and will be of the same average grade, quality and value as similar goods sold under similar circumstances." *Jones v. Abriani*, 350 N.E.2d 635, 645 (Ind. Ct. App. 1976) (citation omitted).  "An action based on breach of warranty requires evidence showing not only the existence of the warranty but also that the warranty was broken and that the breach was the proximate cause of the loss." *Irmscher Suppliers, Inc.*, 909 N.E.2d at 1048 (citing *Frantz*, 711 N.E.2d at 860).

- *Maine – Me. Rev. Stat. Ann. tit. 11 § 2-314* (Count 15)

Under Maine law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 51 (1st Cir. 2005) (citing Me. Rev. Stat. Ann. tit. 11 § 2-314).  "To be 'merchantable,' a good

must be 'fit for the ordinary purposes for which such goods are used.' " *Id.*

(quoting Me. Rev. Stat. Ann. tit. 11 § 2–314(2)(c)).  The "first step in the analysis

is whether the good was being used for its ordinary purposes." *Canning v. Broan-*

*Nutone, LLC*, 480 F. Supp. 2d 392, 412 (D. Me. 2007) (quoting *Koken,* 426 F.3d at

51).  Next, a plaintiff must show that product in question "because of defects either

did not work properly or [was] unexpectedly harmful." *Lorfano v. Dura Stone*

*Steps, Inc.*, 569 A.2d 195, 197 (Me. 1990).  Moreover, a plaintiff is required to

demonstrate the existence of "some defect in the product at the time it was sold in

order to maintain a claim for breach of the implied warranties of merchantability."

*Walker v. Gen. Elec. Co.*, 968 F.2d 116, 119 (1st Cir. 1992) (applying Maine law)

(citations omitted).

- *Nevada – Nev. Rev. Stat. § 104.2314* (Count 17)

Under Nevada law, "a warranty that the goods shall be merchantable is

implied in a contract for their sale if the seller is a merchant with respect to goods

of that kind." *Holmes v. Merck & Co.*, No. 2:04-CV-00608-BES-GWF, 2008 WL

11348410, at *3 (D. Nev. June 16, 2008) (citing Nev. Rev. Stat. 104.2314(1)).

Under an implied warranty of merchantability claim, for goods to be considered

merchantable, they must be "fit for the ordinary purpose for which the goods are

used." *Underwood v. O'Reilly Auto Parts, Inc.*, No. 2:21-CV-01766-GMN-NJK,

2023 WL 3205213, at *7 (D. Nev. May 1, 2023) (citing Nev. Rev. Stat. §

20

104.2314).  The implied warranty of merchantability is breached "when the goods

manifest a defect which renders them unfit for the ordinary purpose for which they

are used."  *Holmes v. Merck & Co.*, No. 2:04-cv-00608, 2008 WL 11348410, at *3

(D. Nev. June 16, 2008) (citation omitted).

- *North Carolina – N.C. Gen. Stat. § 25-2-314* (Count 19)

Under North Carolina law, "a warranty that the goods shall be merchantable

is implied in a contract for sale if the seller is a merchant with respect to goods of

that kind."  *Ascot Corp., LLC v. I&R Waterproofing, Inc.*, 881 S.E.2d 353, 361

(N.C. Ct. App. 2022) (citing N.C. Gen. Stat. § 25-2-314(1)).  To successfully claim

a breach of implied warranty of merchantability, a plaintiff must establish the

following elements:

> (1) a merchant sold goods, (2) the goods were not
> 'merchantable' at the time of sale, (3) the plaintiff (or his
> property) was injured by such goods, (4) the defect or
> other condition amounting to a breach of the implied
> warranty of merchantability proximately caused the
> injury, and (5) the plaintiff so injured gave timely notice
> to the seller.

*Phillips v. Rest. Mgmt. of Carolina, L.P.*, 552 S.E.2d 686, 692 (N.C. Ct. App.

2001) (citing *Ismael v. Goodman Toyota*, 417 S.E.2d 290, 295 (N.C. Ct. App.

1992)).  "A product defect may be shown by evidence a specific defect existed in a

product.  Additionally, when a plaintiff does not produce evidence of a specific

defect, a product defect may be inferred from evidence the product was put to its

21

ordinary use and the product malfunctioned." *DeWitt v. Eveready Battery Co.*, 565

S.E.2d 140, 147 (N.C. 2002) (citation omitted).

Again, Ford alleges that all Plaintiffs' warranty of merchantability claims

should be dismissed because the vehicles are fit for their ordinary purpose, which

is simply to provide transportation. "[T]he decisions on point in implied warranty

cases concerning defective cars have recognized that merchantability implies not

only that a vehicle can provide transportation, but that it can do so in ***a reasonably***

***safe and controlled manner***." *In re FCA US LLC Monostable Elec. Gearshift*

*Litig.*, 280 F. Supp. 3d 975, 1015 (E.D. Mich. 2017) (emphasis added); *see also*

*Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 676 (E.D. Mich. 2020)

("Federal courts considering implied warranty claims in auto defect litigation

consistently have held that an automobile is merchantable or fit for its intended

purpose ***only*** where it is able reliably to operate in a 'safe condition' or to provide

'safe transportation.' ") (emphasis added); *see, e.g., O'Connor v. BMW of N. Am.,*

*LLC*, Civil Action No. 18-cv-03190-CMA-STV, 2020 WL 1303285, at **5–6 (D.

Colo. Mar. 19, 2020); *Tellinghuisen v. Chrysler Grp., Ltd. Liab. Co.*, No. A13-

2194, 2014 WL 4289014, at **2–3, (Minn. Ct. App. Sept. 2, 2014); *Nelson v.*

*Nissan N. Am., Inc.*, 894 F. Supp. 2d 558, 567 (D.N.J. 2012); *Isip v. Mercedes-*

*Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 700 (Cal. Ct. App. 2007). Here, Plaintiffs

from California, Georgia, and Maine allege that they actually experienced a vehicle

22

shutdown while operating the vehicle on roads, or their vehicle would not start at some point.  These instances demonstrate viable arguments that the vehicles did not provide a safe or reliable means of transportation, and therefore cannot be considered fit for their ordinary use, or merchantable.

Conversely, Plaintiffs from Pennsylvania, Indiana, Nevada, and North Carolina, do not allege sufficient facts on the face of the Amended Complaint to show that their vehicles were not reasonably safe for them to operate.  For example, Plaintiffs in this group express "concern" over driving the vehicles, concerns about Ford's fix and feelings of the vehicles being "unsafe."  However, there is no mention of the vehicles actually placing them in a situation that could reasonably be considered unsafe or unreliable; the vehicles were fit for their ordinary purposes.  Thus, Plaintiffs from Pennsylvania, Indiana, Nevada, and North Carolina have failed to state a claim for a breach of the implied warranty of merchantability.  As such, the Court is dismissing Counts 5, 13, 17, and 19.

## 2.  *Privity*

Ford argues that the implied warranty claims under the laws of Georgia, Nevada, and North Carolina, fail as for a lack of contractual privity regarding Plaintiffs Myers (Georgia), Pettiford (Nevada), and Gutierrez (North Carolina). Because Plaintiff Pettiford and Plaintiff Gutierrez have failed to sufficiently allege that their vehicles were not fit for their ordinary purpose, and therefore failed to

state a claim for the implied warranty of merchantability, the Court need not

determine whether privity exists as to them.

### i.    Georgia

Turning to Plaintiff Myers' claims, under Georgia law, "to recover under a

theory of breach of implied warranty of merchantability, a plaintiff must have

privity with the seller. " *Keaton v. A.B.C. Drug Co*., 467 S.E.2d 558, 561 (Ga.

1996).  In cases involving automobile manufacturers, privity exists between buyers

and manufactures if the manufacturer extends an express warranty to the buyer

through an authorized dealer.  *See Chrysler Corp. v. Wilson Plumbing Co., Inc.*,

208 S.E.2d 321, 323 (Ga. Ct. App. 1974) ("However, where an automobile

manufacturer, through its authorized dealer issues to a purchaser of one of its

automobiles from such dealer admittedly as a part of the sale a warranty by the

manufacturer running to the purchaser, privity exists.").  Here, the Court finds that

because Plaintiff Myers purchased his affected vehicle—which was new—from

Five Star Ford of Warner Robins, an authorized Ford dealership, he is in privity

with Ford.  *See, e.g., McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1362 n.5

(N.D. Ga. 2013) (plaintiff who purchased a used Mercedes-Benz from an

authorized dealer was in privity with Mercedes-Benz USA).  Moreover, Ford has

not presented any evidence to dispute this.  As such, Plaintiff Myers' implied

warranty of merchantability claim is not barred for lack of privity.

24

### 3. *Pre-Suit Notice*

Ford asserts that under the laws of Nevada, Indiana, Pennsylvania, and Georgia, Plaintiffs from respective states fail to state a claim of implied warranty of merchantability due to a lack of pre-suit notice. Because Plaintiffs from Nevada, Indiana, and Pennsylvania have failed to prove that their vehicles were not fit for their ordinary purpose, and therefore already failed to state a claim for implied warranty of merchantability, the Court will only address Plaintiff Myers for purposes of whether pre-suit notice was provided to Ford.

### i.    Georgia

"Under Georgia law, a retail purchaser's breach of implied warranty claim may only be dismissed for failure to provide timely notice if the defendant shows that it was prejudiced by the delay." *Terrill v. Electrolux Home Prod., Inc.*, 753 F. Supp. 2d 1272, 1287 (S.D. Ga. 2010) (citing *Wal–Mart Stores, Inc. v. Wheeler*, 586 S.E.2d 83, 86–87 (Ga. Ct. App. 2003)). Because filing a complaint satisfies the notice requirement as long as there is no prejudice to the defendant, *see Hudson v. Gaines*, 403 S.E.2d 852, 854 (Ga. Ct. App. 1991), Ford must demonstrate that it will be prejudiced by Plaintiff Myers failure to provide pre-suit notice. *See Terrill*, 753 F. Supp. 2d at 1284 n.8 ("It is unlikely that a defendant could ever show prejudice at the motion to dismiss stage."). Ford does not allege any prejudice. Thus, construing the allegations in the light most favorable to Plaintiffs, the Court

25

finds that Plaintiff Myers has sufficiently alleged that he provided notice to Ford regarding the breach of the implied warranty of merchantability by filing a complaint with this Court.  As such, Plaintiff Myers' claim for a breach of the implied warranty of merchantability will not fail for a lack of pre-suit notice.

### D. State Law Fraud and Consumer Protection Claims

In the Amended Complaint, Plaintiffs bring claims under the following state consumer protection statutes alleging forms of fraud:

- Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1, *et seq*. (Count 4);

- California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (Count 6);

- California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (Count 7);

- Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.* (Count 9);

- Georgia Uniform Deception Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.* (Count 10);

- Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5, *et seq.* (Count 12);

- Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5 § 205-A *et seq.* (Count 14);

- Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.* (Count 16)

- North Carolina Unfair and Deceptive Trade Practices Act,  N.C. Gen. Stat. § 75-1.1, *et seq.* (Count 18)

In its motion to dismiss, Ford argues that Plaintiffs fail to satisfy the Rule 9(b) pleading standards, and as such, have failed to sufficiently allege claims of fraudulent misrepresentation or omission.

Under the "special pleading rules" of Federal Rule of Civil Procedure 9(b), a complaint survives a motion to dismiss if it alleges "with particularity the circumstances constituting fraud or mistake."  *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008).  Unlike Rule 8's requirement for "a short and plain statement of the claim" made by "simple, concise, and direct allegations," *Sanderson v. HCA–The Healthcare Company*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting Fed. R. Civ. P. 8(a)), "Rule 9(b) adds additional pleading requirements for allegations of fraud or mistake, but it should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *U.S. ex rel. SNAPP, Inc.*, 532 F.3d 496 at 503 (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988)).  Although plaintiffs are allowed some "flexibility," *see id.*, they are required, at a minimum, to "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993); *see also Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255 (6th Cir. 2012)

27

(Rule 9(b) is "not only to put defendants on notice of alleged misconduct, but also to prevent fishing expeditions ... and to narrow potentially wide-ranging discovery to relevant matters.") (internal quotations omitted).

### 1. Misrepresentation Claims

In support of their claims for misrepresentation,[1] Plaintiffs point to numerous advertisements and marketing campaigns.  For example, in Ford's 2022 brochure for the Mustang Mach-E, it states that the vehicle has an "all-electric drivetrain with its BREATHTAKING POWER AND TORQUE."  (ECF No. 15 ¶ 77, Pg ID 187–88).  Ford also boasts about the customer getting "electric power-assisted steering and a fully independent suspension, which is designed for lightweight strength, working together to channel this thrilling output to the road." (*Id.* at 188.)  Plaintiffs also point to Ford "promising that consumers can have 'confidence in every mile' in the Mach-E , . . . pre-collision assist, blind spot alerts, lane keeping system, and rear-view cameras."  (*Id.* ¶ 79, Pg ID 188–89.)

Although Plaintiffs allege in numerous places throughout the Amended Complaint that statements made by Ford were "false [and/or] misleading," *see, e.g., id.* ¶¶ 169, 240, 261, 289, 317, 337, 367, Pg ID 222, 240, 245, 253, 258, 263, 271, Plaintiffs fail to point to specific untrue statements and do not allege anything

---

[1] Plaintiffs note that their fraud claims do not "rest" on misrepresentations but on the omissions.  (ECF No 19 at Pg ID 1096.)  This is not clear on the face of the Amended Complaint due to the number of times misrepresentations are alleged.

beyond general advertising to automobile consumers.  Courts have held, and this

Court agrees, that this sort of language is not actionable to allege claims for fraud.

*See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 875 (E.D. Mich. 2019)

(quoting *Ram Int'l Inc. v. ADT Sec. Servs., Inc.*, No. 11-10259, 2011 WL 5244936,

at *6 (E.D. Mich. Nov. 3, 2011), *aff'd,* 555 F. App'x 493 (6th Cir. 2014)

("[P]romises of efficiency and reliability 'cannot form the basis for a fraud

claim.'"); *see, e.g., Raymo v. FCA US LLC*, 475 F.Supp.3d 680, 706 (E.D. Mich.

2020) ("Statements such as 'leading fuel economy,' 'unprecedented performance

and fuel economy,' 'environmentally clean,' 'low-cost of ownership' and 'built to

last for years' are general and nonquantifiable.  The Court therefore considers them

nonactionable puffery."  *Bledsoe v. FCA US LLC*, 378 F.Supp.3d 626, 648–49

(E.D. Mich. 2019) ("Defendants' individual statements along the lines that the

trucks are the cleanest or best in the world are nonactionable puffery").  Ford's

advertisements amount to mere puffery, and as such, Plaintiffs fail to allege a claim

for misrepresentation under the heightened pleading standard of Rule 9(b).

## 2.  *Omission Claims*

Plaintiffs maintain that Ford omitted material facts related to the Shutdown

Risk.  Specifically, Plaintiffs assert that "[t]he Shutdown Risk is the direct result of

a design or manufacturing process that was known or should have been known to

Ford . . . [including] the consequences"  (ECF No. 15 ¶ 6, Pg ID 159.)  And by

29

Ford failing to notify customers or 'omitting' this information, Plaintiffs would not have purchased the vehicles.  Ford maintains that Plaintiffs also fail to sufficiently plead its omission claims under Rule 9(b) because similar to misrepresentation claims, "Rule 9(b) applies with equal force to fraud claims premised on an omission or a failure to disclose."  *William Beaumont Hosp. Sys. v. Morgan Stanley & Co., LLC*, 677 F. App'x 979, 983 (6th Cir. 2017).  Thus, even for a fraudulent omission claim, "Rule 9(b) requires a plaintiff to set forth the 'who, what, when, where, and how' of the alleged omission."  *Ambrose*, 2022 WL 3701946, at *14 (citing *Gamboa*, 381 F.Supp.3d at 873); *see also McKee v. General Motors, LLC*, 376 F.Supp.3d 751, 760–61 (E.D. Mich. 2019).  In other words, "Plaintiffs must set forth: (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud."  *Gamboa*, 381 F. Supp. 3d at 873 (citing *Republic Bank & Tr. Co.*, 683 F.3d at 256).  A complaint may survive a motion to dismiss under the Rule 9(b) pleading standard if "it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product, failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect."

*Wozniak*, 2019 WL 108845, at *3 (citing *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751–52 (E.D. Mich. 2017)).

Here, Plaintiffs failed to plead their alleged "what" regarding Ford's knowledge of the defect at the time of each Plaintiff's purchase, which is required under Rule 9(b) and the majority of the state's fraud or consumer protection laws. *See Wilson v. Hewlett-Packard Co*., 668 F.3d 1136, 1145–47 (9th Cir. 2012) (discussing California law); *McQueen v. Yamaha Motor Corp., U.S.A*., 488 F. Supp. 3d 848, 859 (D. Minn. Sept. 21, 2020) (discussing Indiana law); *Wozniak*, 2019 WL 108845, at *3 n.5 (discussing Nevada, Pennsylvania, and North Carolina's laws)  To support its claim of Ford's alleged knowledge of the defect, Plaintiff points to three things: "(1) the rigorous pre-launch testing of the Shutdown Risk Vehicles; (2) the direct warranty claims from 286 Shutdown Risk Vehicles; and (3) Ford's own investigation of shutdown events in the Shutdown Risk Vehicles."  (ECF No. 15 ¶ 95, Pg ID 194.)

First, Plaintiffs discuss Ford's "durability testing" from a press release on Ford's website, Ex. 6, ECF No. 15-7, which details the tests conducted.  For example, Ford notes that its "comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."  (*Id.* at Pg ID 339.)  Ford also explains that at numerous facilities worldwide, "Ford vehicles and

components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius." (*Id.*) Plaintiff also directs the Court to Ford's "Total Durability Cycle," which is described as a "sped-up evaluation [which] runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks." (*Id.* at Pg ID 340.) This Cycle includes " 'Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test,' and, " 'Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes.' " (*Id.*)

Although Plaintiffs describe in detail the "rigorous testing" conducted by Ford, they fail to provide any actual testing results, which is crucial in alleging whether Ford knew about the defect. *See Smith v. Gen. Motors LLC*, 988 F.3d 873, 884–85 (6th Cir. 2021) (rejecting "theoretical results from pre-production tests without accompanying verification that the tests occurred and revealed a safety defect," and noting that the plaintiffs failed to cite information "confirming or suggesting whether the defect became known"); *see also Roe v. Ford Motor Co.*, No. 2:18-CV-12528-LJM-APP, 2019 WL 3564589, at *6 (E.D. Mich. Aug. 6, 2019), *on reconsideration in part,* 2020 WL 1270778 (E.D. Mich. Mar. 17, 2020)

(noting that plaintiffs must provide "at least a hint as to the test results" to survive a motion to dismiss based on defendant's knowledge of the defect.).

Next, Plaintiffs allege that between July 13, 2021 and May 31, 2022, there were 286 warranty claims related to "spontaneous shutdowns," which demonstrates that Plaintiffs knew about the defect in the vehicles.  (ECF No. 15 ¶ 8, 101 Pg ID 160, 196.)  Specifically, Plaintiffs stated that "on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Shutdown Risk Vehicles."  (*Id.* ¶ 103.)  Plaintiffs also allege that Ford receives complaints directly from customers and its own dealers, which also provides support that Ford knew about the defect.  (*Id.* ¶ 104.)  However, Plaintiffs' reliance on 286 warranty claims out of over 48,924 vehicles sold is far from sufficient to show, or even allege, that Ford had the requisite knowledge of the defect.  *See Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 509 (E.D. Mich. 2021) (noting that "[t]he fact that . . . warranty claims increased says little about when FCA acquired knowledge of the Panel Defect . . . ."); *see also McKee*, 376 F. Supp. 3d at 762 ("allegations based on GM's internal records, communications with its dealerships or service technicians, and review of its warranty data are conclusory and insufficient because they do not plausibly allege that GM 'knew of the defect *prior* to the time it distributed' the Class Vehicles.") (emphasis in original).

Plaintiffs' emphasis on the NHTSA complaints fair no better in its argument that Ford had knowledge of the Shutdown Risk.  Plaintiffs cite to fourteen NHTSA complaints noting that "Ford . . . routinely monitor[s] and analyze[s] NHTSA complaints," *see* ECF No. 15 ¶, Pg ID 196, which courts have determined, and this Court agrees, is insufficient to allege Ford's pre-sell knowledge of a defect.  *See Smith*, 988 F.3d at 885 (allegations that consumer complaints to NHTSA were "monitored" by GM are speculative absent supporting facts that the manufacturer knew about them); *Roe*, 2019 WL 3564589, at *7 ("allegations [of "early consumer complaints"] do[es] not make it reasonable to infer that Ford knew or should have known of the water-pump defect.").  Similarly, allegations that the public reports—including those on an online third-party message board—would provide Ford with knowledge of the Shutdown Risk Defect is also unavailing. (ECF No. 15 ¶ 106, Pg ID 204–05.)  Information located on an unofficial third-party website cannot reasonably or rationally be inferred to provide Ford with knowledge of the Shutdown Risk defect.

Finally, Plaintiffs maintain that Ford's own investigation into the defective vehicles would provide Ford with the requisite knowledge to allege its fraud by omission claims.  However, this argument faces a chronology issue.  According to the Amended Complaint, Ford did not begin its investigation until April 12, 2022, which resulted in the June 2022 recall of the defective vehicles.  (ECF No 15 ¶¶

34

101–02, Pg ID 196.)  The Amended Complaint also alleges that the majority of

Plaintiffs—except Plaintiffs Sherman (Pennsylvania)[2] and Orlando (California),[3]—

all purchased their vehicles *before* Ford opened its investigation.  As stated by

Ford, such "post-dates" do not show that Ford had knowledge at the time of their

individual vehicle purchases.  Although Plaintiff Orlando purchased her vehicle on

May 31, 2022, the Safety Recall Report notes that Ford did not reach a conclusion

on the data under investigation until June 3, 2022.  (ECF No. 15-2 at Pg ID 288.)

Under such circumstances, it cannot be alleged that Ford had such knowledge of

the affected vehicles until it completed the investigation, not while the

investigation was ongoing, which precludes this argument as applied to Plaintiff

Orlando.

Regarding Plaintiff Sherman, he purchased his vehicle almost three months

after Ford issued a recall.  When a plaintiff makes a post-recall purchase, for

consumer protection purposes, the plaintiff must plead "that some fact was

misrepresented or concealed before or in connection with a purchase" to allege a

claim of fraud.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F.

---

[2] Plaintiff Ira Sherman purchased his new Mustang Mach-E in September 2022 from Fred Beans Ford of Newtown in Newtown, Pennsylvania. (ECF No. 15 ¶ 29, Pg ID 168.)

[3] Plaintiff Melissa Orlando purchased her new Mustang Mach-E from Hemborg Ford in Norco, California on May 31, 2022. (*Id.* ¶ 41, Pg ID 173.)

Supp. 3d at 1006 ("[T]here does not appear to be any set of facts on which [plaintiffs] plausibly can allege, under the circumstances, that the defendant intended to, or actually did, conceal from them as consumers information about a defect that was the subject of the April 22, 2016 recall notice.").  Plaintiff Sherman made no such viable argument.

"Although 'knowledge' need be alleged only 'generally' under Civil Rule 9(b), Plaintiffs' general assertions of [Ford's] knowledge without any alleged facts that [Ford] was even aware of the complaints do not rise above mere speculation." *Wozniak*, 2019 WL 108845, at *3 (citing *Twombly*, 550 U.S. at 545).  Furthermore, the fact that the majority of Plaintiffs' allegations are solely based on "information and belief" may allow claims to survive a motion to dismiss, but plaintiffs "must [still] set forth a factual basis for such belief,  and . . . cannot base claims of fraud on speculation and conclusory allegations."  *Smith*, 988 F.3d at 885 (quoting *Sanderson*, 447 F.3d at 878 (internal quotations omitted).  There can be no liability for a fraudulent omission claim under the majority of the state's fraud or consumer protection laws, and certainly under the Rule 9(b) pleading standard, if Plaintiffs are unable to plead the "what" of the alleged omission, namely, Ford's knowledge of the Shutdown Risk defect.  *See e.g, Wozniak*, 2019 WL 108845, at *3.  As such, Counts 4, 6, 7, 9, 10, 12, 14, 16, and 18 are dismissed.

36

## IV.  Conclusion

For the reasons stated above, the Court is dismissing Counts 1, 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, 14, 16, 17, 18, and 19.  Counts 8, 11, and 15 may proceed with litigation.

Accordingly,

**IT IS ORDERED** that Ford's Motion to Dismiss Plaintiff's First Amended Complaint and to Strike Class Allegations (ECF No. 17) is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

s/ Linda V. Parker\
LINDA  V. PARKER\
U.S. DISTRICT JUDGE

Dated: August 11, 2023