# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IRA SHERMAN, LISA SPRADLIN, EDWIN VAN BEUSEKOM, DARRELL HALL, SANFORD SHUSTER, NORMAN CLOUGH, THOMAS DOROBIALA, RICHARD KLEINER, MELISSA ORLANDO, BLAIR MYERS, JOSIP PETRUSIC, BRAD GOSHORN, ADAM CATON, MATTHEW ROTHWELL, DARNELL PETTIFORD, and EDDIE GUTIERREZ, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-11668 **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY, a Delaware Limited Liability Company, | |
| Defendant. | |

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION ................................................................. 7

III.  VENUE ............................................................................. 8

IV.   PARTIES ......................................................................... 8

    A.    Plaintiffs ................................................................. 8

        1.    Ira Sherman (Pennsylvania) ................................ 8

        2.    Lisa Spradlin (Pennsylvania) .............................. 9

        3.    Edwin van Beusekom (New York) ...................... 11

        4.    Darrell Hall (Tennessee) ..................................... 13

        5.    Sanford Shuster (Michigan) ................................ 14

        6.    Norman Clough (Delaware) ................................ 16

        7.    Thomas Dorobiala (California) ........................... 17

        8.    Richard Kleiner (California) ............................... 19

        9.    Melissa Orlando (California) ............................... 22

        10.   Blair Myers (Georgia) ........................................ 23

        11.   Josip Petrusic (Indiana) ...................................... 26

        12.   Brad Goshorn (Indiana) ...................................... 27

        13.   Adam Caton (Louisiana) ..................................... 29

        14.   Matthew Rothwell (Maine) ................................. 30

        15.   Darnell Pettiford (Nevada) .................................. 33

        16.   Eddie Gutierrez (North Carolina) ....................... 35

- i -

B.     Defendant ................................................................... 37

V.    FACTUAL ALLEGATIONS ................................................... 38

A.     Ford marketed the Shutdown Risk Vehicles as functional,
       safe, reliable, and high-performance, and knew these
       attributes were material to consumers. ................................ 38

B.     Ford's Vehicle Warranties ................................................ 43

C.     The Shutdown Risk ........................................................ 44

D.     Ford knew of the Shutdown Risk before it disclosed it to
       Plaintiffs. ..................................................................... 46

       1.     Ford's durability testing uncovered the Shutdown
              Risk. .................................................................... 47

       2.     Ford knew about the Shutdown Risk from warranty
              claims for Shutdown Risk Vehicles and its own
              investigation. ......................................................... 48

E.     All class members could have been made aware of the
       spontaneous Shutdown Risk at the point of sale. ................. 59

VI.   CLASS ALLEGATIONS ......................................................... 60

VII.  CLAIMS ............................................................................. 66

A.     Nationwide Claims ......................................................... 66

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
       ACT (15 U.S.C. § 2301, *et seq.*). ..................................... 66

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW) ................... 71

COUNT III UNJUST ENRICHMENT (COMMON LAW) ............................. 75

B.     State-Specific Claims ...................................................... 76

       1.     Pennsylvania ......................................................... 76

011110-11/2036275 V2

COUNT IV   VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Cons. Stat. § 201-1, *et seq*.) .......................................................... 76

COUNT V VIOLATION OF EXPRESS WARRANTY (13 PA. CONS. STAT. ANN. § 2313) ...................................................................... 81

COUNT VI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. § 2314)................................................................. 85

2.      New York....................................................................... 87

COUNT VII VIOLATION OF EXPRESS  WARRANTY (N.Y. U.C.C. § 2-313)................................................................................................... 87

COUNT VIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW YORK LAW (N.Y. U.C.C. § 2-314) ................................................................................ 90

3.      Tennessee ...................................................... 92

COUNT IX VIOLATION OF EXPRESS WARRANTY  (TENNESSEE CODE § 47-2-313) ...................................................................... 92

COUNT X BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER TENNESSEE LAW (TENNESSEE CODE § 47-2-314) ............................................................ 96

4.      Michigan .................................................................... 98

COUNT XI VIOLATION OF EXPRESS WARRANTY  (MICH. COMP. LAWS ANN.440.2313 AND 440.2860)...................................... 98

COUNT XII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MICHIGAN LAW (MICH. COMP. LAWS ANN.440.2314 AND 440.2862)..................................... 102

5.      Delaware .............................................................. 104

COUNT XIII VIOLATION OF EXPRESS WARRANTY  (6 DE Code § 2-313).................................................................................................. 104

011110-11/2036275 V2

COUNT XIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER DELAWARE LAW (6 DE Code
§ 2-314) ................................................................................................ 107

6. California ................................................................................. 109

COUNT XV VIOLATION OF THE CALIFORNIA CONSUMER
LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, et seq.) .................... 109

COUNT XVI VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) ....................... 113

COUNT XVII VIOLATION OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
Civ. Code §§ 1791.1 & 1792) ................................................................ 116

COUNT XVIII .................................................................................................. 119

7. Georgia .................................................................................... 123

COUNT XIX VIOLATION OF GEORGIA'S FAIR BUSINESS
PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*) .......................... 123

COUNT XX VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE
TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, *et seq.*) ........... 128

COUNT XXI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER GEORGIA LAW (Ga. Code
Ann. § 11-2-314(1)) .............................................................................. 133

COUNT XXII VIOLATION OF EXPRESS WARRANTY (GA. CODE
ANN. § 11-2-313) ................................................................................. 134

8. Indiana ..................................................................................... 138

COUNT XXIII VIOLATION OF THE INDIANA DECEPTIVE SALES
PRACTICES ACT (Ind. Code § 24-5, *et seq.*) ......................................... 138

COUNT XXIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER INDIANA LAW (Ind. Code
§ 26-1-2-314) ....................................................................................... 143

- iv -

COUNT XXV VIOLATION OF EXPRESS  WARRANTY (IN Code §
26-1-2-313) ...................................................................................... 145

9.      Louisiana .................................................................. 148

COUNT XXVI VIOLATION OF EXPRESS WARRANTY  (LA Rev
Stat § 9:2800.51, *et seq.*) .................................................................. 148

COUNT XXVII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER LOUISIANNA LAW (LA. CIV.
CODE ART. 2475, 2520, 2524) ................................................................ 152

10.      Maine ...................................................................... 154

COUNT XXVIII VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT (Me. Rev. Stat. Ann. tit. 5, § 205-A *et seq.*) .............. 154

COUNT XXIX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MAINE LAW (Me. Rev. Stat.
Ann. tit. § 2-314) ............................................................................... 159

COUNT XXX VIOLATION OF EXPRESS WARRANTY (Me. Rev.
Stat. Ann. tit. § 2-313) ....................................................................... 160

11.      Nevada ..................................................................... 164

COUNT XXXI VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT (Nev. Rev. Stat. § 598.0903 *et seq.*) .......................... 164

COUNT XXXII VIOLATION OF EXPRESS WARRANTY  (Nev. Rev.
Stat. § 104.2313) ............................................................................... 169

COUNT XXXIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER  NEVADA LAW (Nev. Rev.
Stat. § 104.2314) ............................................................................... 172

12.      North Carolina ........................................................... 174

COUNT XXXIV VIOLATION OF NORTH CAROLINA'S UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen.
Stat. § 75-1.1, *et seq.*) ....................................................................... 174

011110-11/2036275 V2

COUNT XXXV VIOLATION OF EXPRESS WARRANTY  (N.C. Gen.
Stat. § 25-2-313) .................................................................................... 180

COUNT XXXVI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NORTH  CAROLINA LAW
(N.C. Gen. Stat. § 25-2-314) ...................................................... 183

REQUEST FOR RELIEF ............................................................................... 185

DEMAND FOR JURY TRIAL ....................................................................... 186

011110-11/2036275 V2

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I. INTRODUCTION

1. The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a risk that implicates serious safety issues. And when a car cannot be safely used by its owner while a car manufacturer is developing a fix for a safety risk, the car manufacturer should not shift the risk of a dangerous shutdown event to the owner, but instead should provide or reimburse for comparable replacement transportation.

2. Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Mustang Mach-E vehicles that were dangerously risky to drive and prone to complete and partial shutdown while driving. Then, though Ford knew or should have known of the shutdown risk prior to launching the vehicles, it did nothing to promptly warn owners and lessees, instead waiting over a year after receiving numerous warranty claims exposing the shutdown risk to announce a safety recall. And while Ford now admits that the Mustang Mach-E has a serious safety risk that can cause in-operation power loss and shutdown, it has chosen *not*

- 1 -

*to* design or issue a *bona fide* fix, but rather to degrade the charging and motive power of the Mustang Mach-E so that its ill-designed high-voltage battery main contactors do not overheat and fail.

3.      Even though Ford has admitted that the risk is serious enough that it will not allow its dealers to deliver *any* new Mustang Mach-E vehicles to customers (even if they have been paid for), it has taken no steps to provide substitute transportation or reimbursement, and is instead forcing Mustang Mach-E owners to choose between driving an unsafe car that is prone to spontaneous shutdown, or driving nothing—all the while remaining out of pocket for purchase costs and/or high monthly loan, lease, and insurance payments.

4.      Model year 2021-22 Ford Mustang Mach-E vehicles manufactured between May 27, 2020, and May 24, 2022 (the "Shutdown Risk Vehicles"),[1] were manufactured such that "[t]he design and part-to-part variation of the high voltage

_____

[1] Ford has recalled all Mustang Mach-E vehicles that were produced between May 27, 2020, and May 24, 2022, and it instituted a stop-delivery order to its dealers as of June 14, 2022. Ford admits this manufacturing period covers 48,924 vehicles, which is approximately half of all Mach-E vehicles sold to date. Based upon the description of the Shutdown Risk in Ford's NHTSA submissions, there is no clear reason that the Shutdown Risk would not also affect Mach-E vehicles produced prior to May 27, 2020. Should Ford expand its recall, or, should Plaintiff's counsel's further investigation so warrant, Plaintiff will amend the definition of Shutdown Risk Vehicles to contain additional manufacturing periods.

battery main contactor is not robust to the heat generated during DC fast charging and multiple wide open pedal events[.]"[2] (the "Shutdown Risk").

5. The Shutdown Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle completely or partially loses power while in operation. The Shutdown Risk also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

6. The Shutdown Risk is the direct result of a design and/or manufacturing process that was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Shutdown Risk to consumers both before and after their purchases of model year 2021 and 2022 Ford Mustang Mach-E, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Shutdown Risk—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Shutdown Risk Vehicle spontaneously lose power while the vehicle is in motion.

---

[2] Exhibit 1, Part 573 Safety Recall Report No. 22V-412 at 2-3 (June 21, 2022), available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V412-9582.PDF.

7.     Warranty claims relating to the Shutdown Risk were made to Ford as early as July 13, 2021, just seven months after the December 2020 release date of the first Mach-E models.[3] Yet Ford continued to sell Mach-Es and did nothing to warn purchasers of the Shutdown Risk until it issued its recall and stop-sale order on or about June 3, 2022.

8.     Ford has admitted that it received 286 warranty claims relating to the Shutdown Risk, just between July 13, 2021, and May 31, 2022. And it admits that 100% of the Mustang Mach-E vehicles subject to the recall have the Shutdown Risk.[4]

9.     Ford now claims to have designed a fix, but the fix Ford has proposed to resolve the dangerous Shutdown Risk—a software update—does not actually fix the inadequate high-voltage battery contactors. Instead, based upon information Ford was required to provide to NHTSA, the software update will "*reduce battery power* to prevent damage to the contactor" and it will "*reduce vehicle power* to prevent further damage." Thus, instead of actually fixing the contactors that are prone to fail, Ford instead downgrades the power of the battery *and vehicle power*, rendering performance something less than what Mach-E owners purchased and what Ford promoted for the Shutdown Risk Vehicles.

---

[3] *See id.* at 9.
[4] *See id.* at 9, 1.

10.     It cannot be ignored that the Shutdown Risk Vehicles are *Ford Mustangs.* The Mustang marquis is synonymous with power and speed; Ford promotes—and consumers purchase—these cars based on that marquis. Ford cannot be allowed to shirk its obligation to make a *bona fide* fix of the faulty contactors by degrading performance of these *Mustangs*, but that is exactly what it is trying to do.

11.     A vehicle that has a risk of spontaneously shutting down while in operation is not fit for its ordinary purpose. And a software update that does nothing to *actually fix* a defect, and instead downgrades the performance of the car, is not a fix at all. Ford is placing an unfair burden on class members who are unable to safely operate their vehicles, or must now operate them with reduced power and increased charging time because Ford is choosing to leave a defective component in the vehicle, and reduce performance in the hope that this prevents the defective component from failing.

12.     Many putative class members, not wanting to bear the risk of a dangerous shutdown, or unwilling to own a *Mustang* that has had its power degraded, may be forced to sell their Shutdown Risk Vehicles at a loss because of Ford's conduct and inability or unwillingness to provide a *bona fide* fix that does not degrade vehicle performance.

13. Ford knew or should have known about the Shutdown Risk before the Shutdown Risk Vehicles went to market, and certainly knew well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Shutdown Risk Vehicles; (2) the direct and public reports of hundreds of warranty claims in Shutdown Risk Vehicles; and (3) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

14. While Ford's software update reduces battery power and vehicle power, it offers no reimbursement to Shutdown Risk Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Putative class members are left without a safely operable vehicle, or with a Ford *Mustang* that no longer lives up to its name, marketing, or specifications at the time of purchase.

15. To add further insult to injury, rather than do the right thing and globally offer every consumer a buy-back of their Shutdown Risk Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner or other electric vehicle while storing the dangerous Shutdown Risk Vehicles until such time as it is able to repair them without degrading performance, Ford has done nothing of the sort.

16. Because of Ford's omissions and misrepresentations regarding the Shutdown Risk and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and

breached its express warranties and implied warranties of merchantability. Plaintiffs and other owners and lessees of the Shutdown Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Shutdown Risk, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Dealing with a possible failure of the Shutdown Risk Vehicles also necessitates expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

17.     Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state express and implied warranty acts, and unjust enrichment at common law.

## II.     JURISDICTION

18.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs;

and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

19. This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III. VENUE

20. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV. PARTIES

**A. Plaintiffs**

**1. Ira Sherman (Pennsylvania)**

21. Plaintiff and proposed class representative Ira Sherman ("Plaintiff" for purposes of this subsection) is a resident and citizen of Langhorne, Pennsylvania. In September 2022, Plaintiff purchased a new 2022 Mustang Mach-E from Fred Beans Ford of Newtown in Newtown, Pennsylvania.

22. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance.

- 8 -

Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

23. Plaintiff is also concerned about the supposed "fix" that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

**2.  Lisa Spradlin (Pennsylvania)**

24. Plaintiff and proposed class representative Lisa Spradlin ("Plaintiff" for purposes of this subsection) is a resident and citizen of Garnet Valley,

Pennsylvania. In April 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Paoli Ford in Paoli, Pennsylvania.

25.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before her purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

26.    Plaintiff is also concerned about the update that Ford has performed "over-the-air" to her car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their

- 10 -

battery power and vehicle power reduced, she would not have purchased the vehicle, or she would have paid less for it.

27.     On August 2, 2023, Plaintiff was driving her Shutdown Risk Vehicle when the vehicle's power decreased significantly and stopped responding when she pressed down on the accelerator. Her dashboard lit up with warning lights, and she was able to pull over at a rest stop. Plaintiff called roadside assistance and had her vehicle towed back to a Ford dealership. As of the date of filing, Plaintiff's car remains at the Ford dealership with no timeline for repair.

**3.     Edwin van Beusekom (New York)**

28.     Plaintiff and proposed class representative Edwin van Beusekom ("Plaintiff" for purposes of this subsection) is a resident and citizen of Chester, New York. In August 2022, Plaintiff purchased a used 2021 Mustang Mach-E from DHC Honda of Nanuet in Nanuet, New York. The vehicle had approximately 6,100 miles on it when purchased.

29.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the

- 11 -

safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

30. Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

31. Several months after he purchased his car, and after receiving the over-the-air software update, Plaintiff was unable to turn on his Shutdown Risk Vehicle. Plaintiff called roadside assistance and had his vehicle towed to a Ford dealership. Defendant did not offer a loaner vehicle or rental reimbursement while Plaintiff's car was being serviced.

### 4. Darrell Hall (Tennessee)

32. Plaintiff and proposed class representative Darrell Hall ("Plaintiff" for purposes of this subsection) is a resident and citizen of Taylorsville, Kentucky. In June 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Ford of Columbia in Columbia, Tennessee.

33. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

34. Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-

- 13 -

performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

35.     Plaintiff's vehicle experienced the Shutdown Risk when his son was driving the vehicle home after attending a football game in Louisville. Plaintiff's son had the vehicle towed to a Ford dealership in Louisville, which held Plaintiff's vehicle for approximately a month before fixing it and returning it to Plaintiff.

**5.     Sanford Shuster (Michigan)**

36.     Plaintiff and proposed class representative Sanford Shuster ("Plaintiff" for purposes of this subsection) is a resident and citizen of Bridgman, Michigan. In August 2021, Plaintiff purchased a 2021 Mustang Mach-E from Woodhams Ford in South Haven, Michigan.

37.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the

- 14 -

safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

38.    Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

39.    Plaintiff's vehicle has suddenly lost power three times, including one incident within six months of purchase. In each instance, Plaintiff felt the vehicle's power waver for a moment before it loses power and warning lights appear on the dashboard. Each time Plaintiff experiences sudden power loss, he has taken his vehicle back to the same Ford dealership, and the dealership simply replaces the

same part. Since the repairs, Plaintiff has noticed that his vehicle has considerably less power.

**6.      Norman Clough (Delaware)**

40.      Plaintiff and proposed class representative Norman Clough ("Plaintiff" for purposes of this subsection) is a resident and citizen of Landenberg, Pennsylvania. In July 2022, Plaintiff purchased a new 2022 Mustang Mach-E from Carman Ford in Newcastle, Delaware.

41.      Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

42.     Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

43.     In June 2023, Plaintiff experienced a sudden loss of power in his vehicle while driving on Interstate 95 near Lumberton, North Carolina. Plaintiffs' vehicle suddenly started displaying error signs on the dashboard and lost a significant amount of power. Plaintiff was able to maneuver the car off I-95 and drive to a Ford dealership. Plaintiff and his wife spent the night in a hotel, rented a vehicle the next day, and drove home. Plaintiff received his vehicle back approximately 3-4 weeks later.

**7.      Thomas Dorobiala (California)**

44.     Plaintiff and proposed class representative Thomas Dorobiala ("Plaintiff" for purposes of this subsection) is a resident and citizen of Murrieta, California. On February 18, 2022, Plaintiff purchased a new 2022 Mustang Mach-E from Gosch Ford Temecula in Temecula, California.

- 17 -

45. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

46. Plaintiff is also concerned about the software update that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid a lot less for it.

47.     On February 22, 2022, Plaintiff was driving his Shutdown Risk Vehicle home from Gosch Ford after receiving the Energy Control Module Software update when his dashboard lit up with warning lights. Plaintiff lost control of the Shutdown Risk Vehicle and the vehicle lost power and went into a ditch. Plaintiff drove the Shutdown Risk Vehicle back to Gosch Ford for diagnosis and repair. Plaintiff does not feel safe driving the vehicle.

**8.     Richard Kleiner (California)**

48.     Plaintiff and proposed class representative Richard Kleiner ("Plaintiff" for purposes of this subsection) is a resident and citizen of Bakersfield, California. In February 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Galpin Ford in Van Nuys, California. In March 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Galpin Ford in Van Nuys, California, for his wife.

49.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicles. However, despite touting the safety, dependability, advanced features and high-performance aspect of the

- 19 -

Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchases. Plaintiff and his wife are now concerned about driving the Shutdown Risk Vehicles due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicles had Plaintiff known about the Shutdown Risk.

50. Plaintiff is also concerned about the update that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicles, or he would have paid less for it.

51. In March 2022, Plaintiff was supposed to go to a hockey game, but Plaintiff's Shutdown Risk Vehicle would not start. He called Ford, who told him he could have the vehicle towed to his local Ford dealership. Plaintiff contacted his local Ford dealership, who told him they would not be able to look at the vehicle for six weeks. Plaintiff called Galpin Ford in Van Nuys, California, who said they could get it in sooner, so he had the vehicle towed to that dealership. Ford refused to pay for the tow. Finding a tow truck that could tow Plaintiff's Shutdown Risk

- 20 -

Vehicle was also a nightmare. The first tow truck that came could not tow his Shutdown Risk Vehicle because the tow truck driver could not put it in neutral. It took 3-4 days to find a tow truck driver who was able to tow the vehicle. Plaintiff's Shutdown Risk Vehicle was at the dealership for 1-2 weeks. The dealership had to tear the entire front end off Plaintiff's vehicle to get to the 12-volt battery. The dealership also updated the modules. Since the hard fix, Plaintiff's computer screen now has to be rebooted daily. Additionally, the A/C during the summer has to be tricked into working. Plaintiff has to push it so that the airflow is directed to the windshield (defrost) and then re push it to be in the middle to hit all occupants.

52.    Plaintiff's Shutdown Risk Vehicle had the hard fix while his wife's had the OTA software update. Since then, the Shutdown Risk Vehicles have exhibited battery charging capabilities different from each other. Plaintiff's Shutdown Risk Vehicle charges anywhere from 35-45 miles more than his wife's car. Previously they were about the same. As of September 21, 2022, Plaintiff's Shutdown Risk Vehicle charged to 272 miles while his wife's charged to 236 miles, but once Plaintiff's wife drove one block, her total charge had dropped by 7 miles. Prior to when Plaintiff's Shutdown Risk Vehicle would not start, their vehicles were identical.

**9.      Melissa Orlando (California)**

53.      Plaintiff and proposed class representative Melissa Orlando ("Plaintiff" for purposes of this subsection) is a resident and citizen of Ontario, California. On May 31, 2022, Plaintiff purchased a new 2022 Mustang Mach-E from Hemborg Ford in Norco, California.

54.      Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before her purchase. Plaintiff is now concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

55.      In July 2022, Plaintiff was driving on the freeway when her vehicle shut down. She did not have access to the shoulder of the freeway at that time but

was able to drive to the exit. Her vehicle regained power after she exited the freeway. Plaintiff contacted the dealership and brought her vehicle in for the recall.

56. Plaintiff is also concerned about the software update that Ford has indicated it will perform "over-the-air" to her car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, she would not have purchased the vehicle, or she would have paid less for it.

**10. Blair Myers (Georgia)**

57. Plaintiff and proposed class representative Blair Myers ("Plaintiff" for purposes of this subsection) is a resident and citizen of Macon, Georgia. On June 14, 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Five Star Ford in Warner Robins, Georgia.

58. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were primary reasons Plaintiff

- 23 -

purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase.

59.     Plaintiff's vehicle shut down on June 8, 2022. Plaintiff left his house to take his dog to the groomer which is less than five miles from his home. The Shutdown Risk Vehicle started having issues when Plaintiff pulled into the parking lot. Multiple messages popped up on the dash along with lots of indicator lights, as well as a message in FordPass app. Messages included that the power would be limited and the car needed service. Next, he drove right around the corner to his dentist's office and the Shutdown Risk Vehicle seemed to drive differently. During the drive home from the dentist's office, the vehicle was still driving differently.

60.     When Plaintiff contacted the Ford dealership service department manager where he bought the Shutdown Risk Vehicle, the manager told Plaintiff he did not know anything about working on the electric cars. Plaintiff contacted Ford corporate and spent more than an hour being tossed around to different people, hung up on while being transferred, and finally got someone who knew something about electric cars. Plaintiff explained what the dealership service manager said to him and asked where he should go to find a Ford dealership that can work on electric vehicles. He was told that his dealership was trained and

certified to work on electric cars. That left Plaintiff bewildered as the manager had already told Plaintiff he did not know where to even start with an electric car. The Ford dealership service manager told Plaintiff he would do research and get back to Plaintiff. That was several months ago, with no further communication from the service department manager despite attempts from Plaintiff to follow up.

61.     Plaintiff is very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff did not drive the Shutdown Risk Vehicle for some time out of fear it would catch fire or stop again while driving causing potential bodily injury and/or property damage to himself or others. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

62.     Plaintiff is also concerned about the software update that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

- 25 -

**11.     Josip Petrusic (Indiana)**

63.     Plaintiff and proposed class representative Josip Petrusic ("Plaintiff" for purposes of this subsection) is a resident and citizen of Chicago, Illinois. In February 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Pearson Ford in Zionsville, Indiana.

64.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

65.     Plaintiff recently started getting error codes and is experiencing loss of power. He took it to the dealership, who told him they do not have the part to repair it and they do not know when the part will come in. The Ford dealership

does not have a loaner vehicle available for Plaintiff to use while he is waiting for the part to arrive.

66.    Plaintiff is also concerned about the supposed "fix" that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

**12.    Brad Goshorn (Indiana)**

67.    Plaintiff and proposed class representative Brad Goshorn ("Plaintiff" for purposes of this subsection) is a resident and citizen of Fort Wayne, Indiana. In March 2022, Plaintiff purchased a new 2022 Mustang Mach-E from ODaniel Ford in Fort Wayne, Indiana.

68.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons

- 27 -

Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

69.     Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

70.     In August 2022, Plaintiff was driving his vehicle on the highway and pressed on the accelerator to pass a truck. The car jerked, the display started flashing lights, and then the vehicle lost power. Plaintiff was able to maneuver the vehicle to the side of the road and was unable to make the vehicle move any more. He called Ford to request a tow, but Ford responded that it was not able to send a

tow truck. Ultimately, Plaintiff's insurance company had the vehicle towed to a Ford dealership. Plaintiff was informed that the vehicle received a software update and a physical part replacement, which left him without use of his vehicle for almost a month. Before the shutdown and software update, Plaintiff's vehicle's range was approximately 300 miles. Since receiving the update, his vehicle's range typically is between 250-270 miles, and during the winter, his vehicle's range is approximately 100 miles.

### 13. Adam Caton (Louisiana)

71. Plaintiff and proposed class representative Adam Caton ("Plaintiff" for purposes of this subsection) is a resident and citizen of Palmetto, Florida. In April 2022, Plaintiff purchased a new 2022 Mustang Mach-E from Courtesy Ford in Bureaux Bridge, Louisiana.

72. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other

representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now very concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

73. Plaintiff is also concerned about the update that Ford has performed "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

74. Plaintiff's vehicle has suddenly lost power multiple times while driving on the highway. After the first incident, Plaintiff brought his vehicle to a Ford dealership, which replaced a battery in his vehicle. After that repair, Plaintiff noticed decreased power compared to before the repair and subsequently experienced a sudden loss of power again.

**14. Matthew Rothwell (Maine)**

75. Plaintiff and proposed class representative Matthew Rothwell ("Plaintiff" for purposes of this subsection) is a resident and citizen of Eliot,

- 30 -

Maine. On August 2, 2021, Plaintiff purchased a new 2022 Mustang Mach-E from Key Ford of York in York, Maine.

76.  Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff and his wife purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff or his wife before their purchase. Plaintiff and his wife are now concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff and his wife would not have purchased the vehicle had they known about the Shutdown Risk.

77.  Plaintiff's Shutdown Risk Vehicle suddenly shut down on April 15, 2022, when Plaintiff and his wife were on a road trip from Maine to Florida. They had just charged the Shutdown Risk Vehicle in Connecticut and were at a stoplight, just about to enter the highway, when the vehicle shut down and all the warning lights on the dashboard came on. Although the Shutdown Risk Vehicle

- 31 -

had completely shut down, they were able to coast into a nearby parking lot where they waited three hours for a tow truck to arrive. At some point the 12-volt battery died so the door latches would not work. Thankfully, the tow truck driver had a portable battery charger and was able get the Shutdown Risk Vehicle into neutral for the tow.

78.     Plaintiff had difficulty finding a Ford dealership nearby that was open on a Saturday. The one they found told him they only had one guy who knew anything about electric vehicles and that he would not be able to look at the vehicle for two weeks. Plaintiff contacted his insurance company, who had the Shutdown Risk Vehicle towed to Key Ford of York in York, Maine, where it was in the shop for a month. The dealership replaced the faulty hardware and returned the Shutdown Risk Vehicle to Plaintiff.

79.     Plaintiff downloaded the recall software on July 6, 2022. On July 12, 2022, the same warning lights from April came on, but this time the Shutdown Risk Vehicle continued to drive at a decreased power. Plaintiff brought the vehicle back to the dealership where he was informed that the part needed to fix the Shutdown Risk Vehicle is backordered and not in the country. Plaintiff was told that it could take anywhere from one to six months to come in.

80.     Plaintiff and his wife are also concerned about the software update that Ford has indicated it will perform "over-the-air" to their vehicle. One of the

major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff and his wife do not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff and his wife known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, they would not have purchased the vehicle, or they would have paid less for it.

**15.    Darnell Pettiford (Nevada)**

81.    Plaintiff and proposed class representative Darnell Pettiford ("Plaintiff" for purposes of this subsection) is a resident and citizen of Henderson, Nevada. In June 2021, Plaintiff purchased a new 2021 Mustang Mach-E from Ford Country in Henderson, Nevada.

82.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicle. However, despite touting the safety, dependability, advanced features and high-performance aspect of the Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other

representatives disclose the Shutdown Risk to Plaintiff before his purchase. Plaintiff is now concerned about driving the Shutdown Risk Vehicle due to the dangers resulting from the Shutdown Risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Shutdown Risk.

83.    Plaintiff is also concerned about the supposed "fix" that Ford has indicated it will perform "over-the-air" to his car. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high-performance driving. Plaintiff does not want to own a Mustang that has had its battery and electric drive depowered to prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased the vehicle, or he would have paid less for it.

84.    Plaintiff and his wife do not feel safe driving the vehicle if there is any possibility that the vehicle could shutdown while driving on the freeway. Plaintiff's Shutdown Risk Vehicle was stuck at Ford Country in Henderson, Nevada, for months because Plaintiff's Shutdown Risk Vehicle was unable to receive updates over-the-air (OTA), which was one of the advertised features of the vehicle. Moreover, the dealership was unable to update the vehicle. They worked with Ford engineers, who were similarly perplexed by Plaintiff's Shutdown Risk Vehicle's inability to accept software updates either OTA or when

the vehicle is physically connected. This is not the first time that this issue had occurred. This is a chronic problem with Plaintiff's Shutdown Risk Vehicle. The dealership was finally able to get the updates installed on the vehicle. Additionally, Plaintiff's Shutdown Risk Vehicle has very recently done a couple of OTA updates. To the best of Plaintiff's knowledge, this was the first time that Plaintiff's Shutdown Risk Vehicle has done this in over a year of ownership.

**16.    Eddie Gutierrez (North Carolina)**

85.    Plaintiff and proposed class representative Eddie Gutierrez ("Plaintiff" for purposes of this subsection) is a resident and citizen of Mebane, North Carolina. In January 2022, Plaintiff purchased his first Mustang Mach-E from County Ford in Graham, North Carolina. Plaintiff was impressed with the performance of his first Mustang Mach-E, and, unaware of the Shutdown Risk, purchased another Mustang Mach-E in February 2022.

86.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety, and Ford's marketing of the vehicle's modern electric drive and high performance. Plaintiff was also acutely aware of the marketing and reputation of the Mustang being synonymous with high performance. These were the primary reasons Plaintiff purchased the Shutdown Risk Vehicles. However, despite touting the safety, dependability, advanced features and high-performance aspect of the

Shutdown Risk Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Shutdown Risk to Plaintiff before his purchases. Plaintiff and his wife are now concerned about driving their Shutdown Risk Vehicles due to the dangers resulting from the Shutdown Risk.

87. Plaintiff's Shutdown Risk Vehicle that was purchased in February 2022, has never been able to receive updates over-the-air, which was one of the advertised features of the vehicle. As a result, he is required to bring the Shutdown Risk Vehicle to the dealership every time it needs a software update.

88. Since receiving notice of the recall, Plaintiff and his wife have limited their use of their Shutdown Risk Vehicles. But they still have to drive them, even with the risk of spontaneous shutdown and loss of power, because the dealer would not provide them a loaner. Plaintiff has contacted Ford Customer Service and their Ford dealership to express their concerns; both say they cannot do anything for them. Plaintiff would not have purchased the vehicles had Plaintiff known about the Shutdown Risk.

89. Plaintiff is also concerned about the supposed "fix" that Ford has indicated it will perform "over-the-air" to the Shutdown Risk Vehicles. One of the major drivers of Plaintiff's decision to purchase the Mustang Mach-E was the reputation of the Mustang model for high performance driving. Plaintiff does not want to own Mustangs that have had their battery and electric drive depowered to

prevent manifestation of the Shutdown Risk. Had Plaintiff known that the Shutdown Risk Vehicles would have their battery power and vehicle power reduced, he would not have purchased these vehicles, or he would have paid less for them.

**B.     Defendant**

90.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

91.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln brand motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

92.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Shutdown Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Shutdown Risk Vehicles, with the intent that such documents be purposely

- 37 -

distributed throughout all 50 states. Ford authorized dealers to distribute these materials at the point-of-sale and controls all written representations made at the dealership. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

93. As further detailed below, Ford-authorized automobile dealerships act as Ford's agents in selling automobiles under the Ford brand name and disseminating vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V. FACTUAL ALLEGATIONS

**A. Ford marketed the Shutdown Risk Vehicles as functional, safe, reliable, and high-performance, and knew these attributes were material to consumers.**

94. The Shutdown Risk Vehicles are marketed to consumers as functional, safe, reliable, high-performance vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs. As the Ford marketing materials cited below show, Ford was aware that safety, reliability, performance, and functionality were material. Having spoken on the subject, as set forth below, Ford had a duty to

disclose material facts related to the accuracy of the misrepresentation, and, as set forth below, Ford made omissions of material fact on these subjects in these marketing materials.

95. In the sales brochure for the 2021 Ford Mustang Mach-E, Ford introduces the model as: "Infused with legendary Mustang heritage as well as its iconic design cues, Mustang Mach-E blends dynamic performance with SUV styling, plus cutting-edge connectivity and electrification to create the newest member of the Mustang family."[5]

96. Ford also touts the high-performance attributes of the Mach-E: "With a bold, powerful presence and spirited handling, the all-new Mustang Mach-E is getting ready to charge."[6]

---

[5] *See* **Exhibit 2**, MY 2021 Ford Mustang Mach-E brochure, at 2.
[6] *See id.*



97.     Ford's 2022 brochure continues the mantra of high-performance, safety and reliability: "Ford Mustang Mach-E® delivers a driving experience like no other Mustang before it. We're talking uninhibited exhilaration on every drive – courtesy of the all-electric drivetrain with its BREATHTAKING POWER AND TORQUE. It takes less than half a second to reach maximum torque. You also get electric power-assisted steering and a fully independent suspension, which is designed for lightweight strength, working together to channel this thrilling output to the road."[7]

---

[7] *See* **Exhibit 3**, MY 2022 Ford Mustang Mach-E brochure, at 4.



98.    Ford insists that the Mach-E lives up to its Mustang DNA[8]:

99.    In addition to the Mach-E's high-performance, Ford also stressed the alleged safety of the vehicles, as Ford knew this was a material attribute for consumers. Promising consumers can have "confidence mile after mile" in the Mach-E, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Shutdown Risk Vehicles.[9]

---

[8] *See id.* at 2.
[9] *See id.* at 10.



100.   Ford also markets the specific safety features of the Mustang Mach-E, including "Personal Safety Systems."[10]

**SAFETY & SECURITY**

Personal Safety System™ for driver and front passenger includes dual-stage front airbags,⁵ safety belt pretensioners, safety belt energy management retractors, safety belt usage sensors, driver's seat position sensor, crash severity sensor, restraint control module and Front-Passenger Sensing System

Driver's knee, glove-box-door-integrated knee, front-/rear-seat side, and side-curtain airbags⁵

Individual Tire Pressure Monitoring System (TPMS)

MyKey® technology to help encourage responsible driving

SOS Post-Crash Alert System™

---

[10] *See id.* at 13.

101. Consumers paid a premium price for the Shutdown Risk Vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2022 Ford Mustang Mach-E starts at $44,995 for the base-level "Select" trim and goes up to $63,095 for the "GT" model.[11]

102. Plaintiffs and putative class members paid the premium prices commanded by the Shutdown Risk Vehicles because of these qualities touted by Ford, especially the long-promoted high performance associated with the Mustang brand.

**B. Ford's Vehicle Warranties**

103. Ford's New Vehicle Limited Warranty for the model year 2021-22 Ford Mustang Mach-E provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[12] Ford's Powertrain Warranty provides coverage for 5 years/60,000 miles, whichever comes first.[13] Specifically relevant here, "Mustang Mach-E unique electric components are covered during the Hybrid/Electric Unique Component Coverage, which lasts for 8 years or 100,000 miles (whichever comes first)."[14] On information and belief, this warranty

---

[11] *See* **Exhibit 4**, *2022 Ford Mustang Mach-E MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/ford/mustang-mach-e/ (last visited July 18, 2022).

[12] *See* **Exhibit 3**, MY 2022 Ford Mustang Mach-E brochure, at 16.

[13] *See id.*

[14] *See id.*

coverage includes safety risks like the Shutdown Risk in the Shutdown Risk Vehicles, and it includes the high voltage battery main contactors that Ford admits are defective.

104. Because the Shutdown Risk Vehicles are all model year 2021 or 2022 vehicles sold or leased to putative class members since the Mustang Mach-E was released in December 2020, virtually all Shutdown Risk Vehicles—if not all of them, including Plaintiffs' vehicles—are still covered under Ford's new vehicle, powertrain and Hybrid/Electric Unique Component Coverage warranties.

**C. The Shutdown Risk**

105. As Ford now admits in a June 10, 2022, safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), the Shutdown Risk Vehicles were designed and manufactured in such a manner that can cause them to spontaneously partially or fully lose power while in operation.[15]

106. Ford further admits that the Shutdown Risk Vehicles "may lose drive power, increasing the risk of a crash."[16]

---

[15] *See* **Exhibit 5**, June 13, 2022 NHTSA letter to Ford, https://static.nhtsa.gov/odi/rcl/2022/RCAK-22V412-1954.pdf.

[16] *See id.* at 1.

107.   Ford's recall, number 22V-412, affects 48,924 model year 2021 and 2022 Ford Mustang Mach-E vehicles built from May 27, 2020, through May 24, 2022.[17]

108.   Included in the 573 Report is Ford's "Description of the Cause: The design and part-to-part variation of the high voltage battery main contactor is not robust to the heat generated during DC fast charging and multiple wide open pedal events."[18]

109.   Thus, Ford admits that the high-voltage main battery contactor cannot handle (i) the heat generated from DC fast charging (which is a normal aspect of the intended operation of the Mustang Mach-E) and (ii) the heat generated from multiple wide open pedal events (something that the Mustang is known for and that is entirely consistent with its marketing message of a high-performance vehicle).

110.   But Ford's recall repair is wholly silent as to the defective high-voltage battery main contactor. It intends to leave the defective high-voltage battery main contactors exactly as they are and instead apply a software change that will "reduce battery power" and "reduce vehicle power" to prevent damage to the contactor.[19]

---

[17] *See* **Exhibit 1**, Part 573 Safety Recall Report, at 1, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V412-9582.PDF.
[18] *See id*. at 1-2.
[19] *See id.* at 10.

- 45 -

111.   Ford also admitted that its investigation revealed 286 warranty claims related to the Shutdown Risk, beginning at least as early as July 13, 2021—nearly a year before it began notifying Shutdown Risk Vehicle owners through the recall process.[20]

112.   On information and belief, Ford failed to adequately research, design, test, and manufacture the Shutdown Risk Vehicles before warranting, advertising, promoting, marketing, and selling the Shutdown Risk Vehicles as high performance, suitable and safe for use in an intended and reasonably foreseeable manner.

113.   On information and belief, Ford knew or should have known the Shutdown Risk Vehicles contained the Shutdown Risk and should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

114.   Plaintiffs' counsel continues to investigate whether additional manufacturing periods of the Mustang Mach-E are also plagued with the Shutdown Risk.

**D.      Ford knew of the Shutdown Risk before it disclosed it to Plaintiffs.**

115.   On information and belief, Ford knew or should have known about the Shutdown Risk before the Shutdown Risk Vehicles went to market, and it certainly

---

[20] *See id.* at 9.

- 46 -

knew well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Shutdown Risk Vehicles; (2) the direct warranty claims from 286 Shutdown Risk Vehicles; and (3) Ford's own investigation of shutdown events in the Shutdown Risk Vehicles.

### 1.     Ford's durability testing uncovered the Shutdown Risk.

116.   Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[21]

117.   According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[22] These tests include stresses on the engines, moving parts, suspension, and electrical components.[23]

---

[21] *See* **Exhibit 6**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, FORD.COM (OCT. 7, 2019), https://media .ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes- -how-fords-multiple-testing-facilities-p.html.
[22] *See id.*
[23] *See id.*

118. Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[24] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test," and, "Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[25]

119. On information and belief, the Shutdown Risk Vehicles were put through similar durability testing or designed and built in accordance with the findings of such durability testing.

120. Based on such durability testing, Ford uncovered the Shutdown Risk before the Shutdown Risk Vehicles were sold to Plaintiffs and the putative class members.

**2. Ford knew about the Shutdown Risk from warranty claims for Shutdown Risk Vehicles and its own investigation.**

121. According to its recall chronology, Ford opened an investigation into the spontaneous shutdowns on April 12, 2022. By that time, Ford reports knowledge of *286 warranty claims*.

---

[24] *See id.*
[25] *See id.*

122. Ford's investigation continued up until the June 2022 recall. Ford's investigation included reviews of high-voltage battery main contactor issues in other model lines.

123. All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Shutdown Risk Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

124. Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Shutdown Risk Vehicles and the Shutdown Risk. At a minimum, Ford received complaints from angry owners and lessees such as Plaintiffs after learning about the Shutdown Risk.

125. For example, the following complaints were lodged with NHTSA, which Ford also monitors:

July 26, 2022 **NHTSA ID NUMBER: 11475967**
**Components: ELECTRICAL SYSTEM**
**NHTSA ID Number:** 11475967

**Incident Date** May 13, 2022

**Consumer Location** CULVER CITY, CA

**Vehicle Identification Number** 3FMTK3R73MM****

- 49 -

**Summary of Complaint**

The contact owns a 2021 Ford Mustang Mach-E. The contact stated that the vehicle failed to start. The contact stated that "Stop Safely Now" and "Accessory Power Active" messages were displayed. The contact exited the vehicle and upon attempting to unlock the doors, the doors failed to unlock. The contact was unable to unlock the vehicle for several hours and remained stranded on the side of the road while awaiting assistance from Roadside Assistance. The vehicle was towed to the dealer where the battery was replaced and an unknown software update was completed; however, the failure recurred. The contact later received notification of NHTSA Campaign Number: 22V412000 (Electrical System) however, the part to do the recall repair was not yet available. Airport Marina Ford (5880 W Centinela Ave, Los Angeles, CA 90045) was also contacted. The vehicle was not repaired. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the failure. The failure mileage was approximately 6,000. Parts distribution disconnect.

July 22, 2022 **NHTSA ID NUMBER: 11475350**
**Components: ELECTRICAL SYSTEM, SERVICE BRAKES, FUEL/PROPULSION SYSTEM**

**NHTSA ID Number:** 11475350

**Incident Date** July 22, 2022

**Consumer Location** SAN ANTONIO, TX

**Vehicle Identification Number** 3FMTK4SE3MM****

**Summary of Complaint**

The HVBJB subassembly in ALL Ford Mach-e vehicles has known defects with 'under-designed' main contactors that known to fail under normal charging and driving conditions as outlined in current open Ford recall notice for my vehicle 22s41. Any internal damage to contactors is not externally visibley, and warning notices on display only after damage has occurred, and can result in sudden loss of propulsion power at highway speed, loss of power steering, power brakes and failure of other 12v systems due to failure to charge the 12v battery properly after contactors are damaged. Less catastrophic results can include failure to start; which

- 50 -

can 'strand' driver's and passengers in remote areas, bad weather conditions, as well as cause loss of use for weeks due to delays in replacement parts and local Dealerships NEED equipment and training to effect removal/replacement of faulty unit with a new HVBJB having re-designed 'beefier' components.? ? My complaint is that Ford's recall notice 22s41 is a software-only band aid and does not require removal of the parts KNOWN TO FAIL. These parts should be replaced with the re-designed components which are available, and have been used to repair failures under warranty. I have no way of inspecting the original equipment to evaluate current condition; and failure can result in sudden and unexpected loss of power, steering, and braking as well as potentially 'stranding me' in unsafe conditions unable to re-start my vehicle.? I suffered a failure related to this post-recall and had a sudden and permanent loss of power while driving at Texas highway speeds (70mph) in congested morning traffic. Fortunately I was able to make my way off the highway but other conditions could have ended up worse. ? Software "fixes" are not the solution and the actual problem of the defective parts need to be replaced in the affected models to avoid possible injuries and fatalities from these vehicles.

July 9, 2022 **NHTSA ID NUMBER: 11473016**
**Components: POWER TRAIN, ELECTRICAL SYSTEM, FUEL/PROPULSION SYSTEM**
**NHTSA ID Number:** 11473016

**Incident Date** July 8, 2022

**Consumer Location** GOLDENS BRIDGE, NY

**Vehicle Identification Number** 3FMTK3SU8MM****

**Summary of Complaint**

While returning from vacation, driving home on the highway, our car suddenly stopped working. We had been traveling at approximately 65 mph on SR 1 in Delaware when I accelerated to pass another vehicle and the car suddenly jolted forward and the engine seized. I received a warning to pull to a safe location as soon as possible. Thankfully, we were able to pull the car over to the shoulder of the highway without incident. The cars electrical system gradually shut down, limiting our ability to place the vehicle in neutral for towing. Approximately 250 miles from home and forced to wait more than 2 hours in the 90 degree weather with no AC, we were forced to bring the car to the nearest ford dealership in new castle Delaware. Since the battery and power completely failed, the dealership had to jump the 12 volt battery several times to get the car back in neutral to remove

- 51 -

the vehicle from the tow truck. We needed to find our own car rental as neither the dealership nor ford customer service would assist with getting us back home to NY.

July 3, 2022 **NHTSA ID NUMBER: 11472202**
**Components: UNKNOWN OR OTHER**
**NHTSA ID Number:** 11472202

**Incident Date** June 30, 2022

**Consumer Location** SUNNYVALE, CA

**Vehicle Identification Number** 3FMTK4SX6MM****

**Summary of Complaint**

My car had Ford recall campaign software patch 22S41 applied to it on Tuesday June 28, 2022. On Thursday June 30, 2022 (two days later), my car suffered its second catestrophic failure of its High Voltage Battery Junction Box. This failure was the exact safety problem Ford's recall software patch was representing to "fix". My family and I were driving from SF Bay Area to Los Angeles, and the car exhibited a "Service Vehicle Soon" warning while driving on I-5 South at Castic, CA. My power was limited to only 30% of available power, and I drove to a Ford dealer over 2 hours on local roads without turning off the car from the mountains in an attempt to not be stranded catestrophically. My vehicle is currently having its contactors replaced for a second time in less than 3 months, this time with a different revised part from Ford that has higher engineering tolerances. Ford refuses to offer this part to current owners of the Mach-E, and is awaiting owners to have their vehicles fail catestrophically like mine before providing access under warranty to a part that fixes their serious safety defect. New Mach-Es are produced in the factory with the revised contactors, which Ford would probably not do were the software patch it provides to current owners sufficient to address the safety issue.

June 21, 2022 **NHTSA ID NUMBER: 11470258**
**Components: STEERING, POWER TRAIN, ELECTRICAL SYSTEM**
**NHTSA ID Number:** 11470258

**Incident Date** June 20, 2022

**Consumer Location** COSTA MESA, CA

**Vehicle Identification Number** 3FMTK3su3mm****

- 52 -

**Summary of Complaint**

While legally passing a car on a 2-lane highway, at over 50+ mph, the car lost motive power and began to shut down leaving me with no power facing on coming traffic. I had no choice but to force other cars to slow down behind me, causing another hazard, in order to get to the side of the road. I could have been killed in an oncoming car collision.

June 21, 2022 **NHTSA ID NUMBER: 11470258**
**Components: STEERING, POWER TRAIN, ELECTRICAL SYSTEM**
**NHTSA ID Number:** 11470258

**Incident Date** June 20, 2022

**Consumer Location** COSTA MESA, CA

**Vehicle Identification Number** 3FMTK3su3mm****

**Summary of Complaint**

While legally passing a car on a 2-lane highway, at over 50+ mph, the car lost motive power and began to shut down leaving me with no power facing on coming traffic. I had no choice but to force other cars to slow down behind me, causing another hazard, in order to get to the side of the road. I could have been killed in an oncoming car collision.

May 17, 2022 **NHTSA ID NUMBER: 11465012**
**Components: FUEL/PROPULSION SYSTEM**

**NHTSA ID Number:** 11465012

**Incident Date** May 1, 2022

**Consumer Location** POWAY, CA

**Vehicle Identification Number** 3FMTK3R70MM****

**Summary of Complaint**

Bricked Mach E Extended Range with 10K miles and recently completed the roof and windscreen recall the week prior. Went to brunch and then came out to a car that would not start. Warning of "Stop Safely Now" even though the vehicle was

- 53 -

driven to the location and then sat for 2 hours and was currently parked and still gave us this message. Low voltage (12 Volt) came in slightly low at 12.6 VDC. Attempted two jumps from another vehicle and a higher amperage tow truck with no change in error code nor would the vehicle "start". We resulted in doing a tow to a dealership for potential repair. Dealership has had it now for going on the third week. They are citing the replacement of the battery bus where the Low Voltage 12 VDC interfaces with the brains and main battery system. This has been cited before in the Mustang Mach E blogs. Replacement part is on hand but the dealership has a specialist being flown in to remedy the replacement part installation. Read in Mach E forums of similar problems where the battery became low and the vehicle was then disabled from engaging the drivetrain. Overall problem gave us pause on ownership and we will qualify for the Lemon Law buyback for CA if it comes to that. Looking to see if repairs will be complete this week.

May 13, 2022 **NHTSA ID NUMBER: 11464559**
**Components: FUEL/PROPULSION SYSTEM**
**NHTSA ID Number:** 11464559

**Incident Date** February 4, 2022

**Consumer Location** BELLEVILLE, MI

**Vehicle Identification Number** 3FMTK4SX1MM****

**Summary of Complaint**

I received a "Stop Safely Now" message upon returning to my vehicle at the end of a work day. The vehicle would not shift into drive, but accessory power did work. It was late at night and in a hospital parking structure, I was forced to leave the vehicle there overnight. After some unsuccessful troubleshooting the next day, I had to call a tow truck and have the vehicle brought to a dealer for repair. It was diagnosed with a faulty BECM (Battery Energy Control Module). After repair, I have not yet seen a repeat occurred the issue.

April 28, 2022 **NHTSA ID NUMBER: 11462618**
**Components: UNKNOWN OR OTHER, ELECTRICAL SYSTEM**
**NHTSA ID Number:** 11462618

**Incident Date** October 29, 2021

**Consumer Location** PLANTSVILLE, CT

**Vehicle Identification Number** 3FMTK1SS9MM****

**Summary of Complaint**

At around 600 miles my vehicle displayed "high voltage battery warning" and "powertrain malfunction" dashboard warning lights. Each light had an associated description that indicated the vehicle's power could fail at any time. This is a 1st model year all electric vehicle. The fact this occurred within 1k miles of ownership is concerning. I took it to a local Ford dealer, ultimately they replaced the high voltage battery junction box and battery electronic control module.

April 26, 2022 **NHTSA ID NUMBER: 11462170**
**Components: UNKNOWN OR OTHER**
NHTSA ID Number: 11462170

**Incident Date** April 18, 2022

**Consumer Location** RIPON, CA

**Vehicle Identification Number** 3FMTK3R73MM****

**Summary of Complaint**

I was driving 70 mph on Hwy 99 in California about 35 miles north of Bakersfield when the car suddenly lost all power. A warning message appeared on the dash "stop safely now." I was able to coast over to the side of the road (there really wasn't much of a shoulder). It was extremely unsafe. The car would not move out of gear, would not start, etc. The car has 1550 miles on the odometer. I waited 1.5 hours for a tow truck to take the car to a Ford dealer. I was 4 hours from home. I am a 71 year old widow. I was traveling alone with my small dog. It was very frightening. The car has been at the dealership for a week. They have no idea what the problem is. The dealer is working with "a Ford engineer" to diagnose the problem. The Mustang Mach-E owners' forums are FILLED with complaints from other owners who are experiencing the exact same problem with this car.

April 25, 2022 **NHTSA ID NUMBER: 11462062**
**Components: POWER TRAIN, ELECTRICAL SYSTEM,**
**FUEL/PROPULSION SYSTEM**
NHTSA ID Number: 11462062

**Incident Date** April 24, 2022

**Consumer Location** PORTLAND, OR

- 55 -

**Vehicle Identification Number** 3FMTK3SUXMM****

**Summary of Complaint**

Was driving 55+ mph on freeway, was told by the car to 'stop safely' Had no accelleration, no power steering, came to a stop at a stop sign, could not shift to neutral to move it.

April 25, 2022 **NHTSA ID NUMBER: 11462003**
**Components: ELECTRICAL SYSTEM, VEHICLE SPEED CONTROL, SERVICE BRAKES**
**NHTSA ID Number:** 11462003

**Incident Date** April 21, 2022

**Consumer Location** LINCOLN, DE

**Vehicle Identification Number** 3fmtk4se4mm****

**Summary of Complaint**

While driving around a curve, my car lost all power and went completely dark. I didn't have brakes, steering, lights or any other functions. My car was completely bricked. This happened before daylight and I didn't have emergency flashers to notify other drivers I was stopped on the side of the road. After waiting for 6 hours for a tow truck, I went and tried to find the problem myself. I found a loose connection. It was the main power feed supplying the fuse box. Once I tightened it up, I was able to start and drive the car. I've attached a picture of the connection I tightened.

April 12, 2022 **NHTSA ID NUMBER: 11460585**
**Components: UNKNOWN OR OTHER**
**NHTSA ID Number:** 11460585

**Incident Date** April 12, 2022

**Consumer Location** CULLMAN, AL

**Vehicle Identification Number** 3fmtk3suxmm****

**Summary of Complaint**

Was driving home and stoped at a business with no issues. Return to car to operate and car not functioning properly. Getting error light "Stop safely now". Car will not start with power button, will only go into full accessory power mode. The car

cannot be switched from park to anything else. R, N, D not accessible. It seems that a system update was recently pushed to the vehicle.

June 18, 2021 **NHTSA ID NUMBER: 11421384**
**Components: SERVICE BRAKES, ENGINE**
**NHTSA ID Number:** 11421384

**Incident Date** June 9, 2021

**Consumer Location** DEARBORN, MI

**Vehicle Identification Number** 3FMTK3R7XMM****

**Summary of Complaint**

While driving on a mountain pass, my 2021 Mustang Mach-E vehicle lost all regenerative braking which, due to the downhill grade, caused a sudden and shocking increase in speed, played warning chimes, and displayed "Stop Safely Now" and "1-Pedal Drive Fault Press Brake Pedal To Reduce Speed" and lost all drive power, forcing me to coast to a stop on the side of the mountain, in an area without cellular coverage to call for help. The vehicle did not restart and would not shift out of Park in 5 attempts to restart. After 10 minutes on the side of the road, the vehicle restarted without issue and no error messages remain in the vehicle.

126. As early as February, 2021, consumers were complaining about the

Shutdown Risk on the Ford Mustang Mach-E Forum, which Ford regularly

monitors:

> On Facebook and another forum there are numerous issues with the Mustang Mach E. One owner had his new car stall out in an intersection (later it was revealed 3 or 4 owners had similar issues with getting the warning on their dashboard). Another had the car become totally unresponsive (Bricked) until he was able to jump the 12 volt battery. Numerous others have had the 12 volt battery gone dead. There are many issues with PaaK not working (Android especially) and some other software problems.

- 57 -

> The dealers don't know how to correct these issues yet and
> Ford Engineers are coming out to assess the problems.[26]

127.    Ford has yet to actually fix any of the high-voltage battery main contactors in the Shutdown Risk Vehicles. Instead, Ford has instituted an "over-the-air" software change that detunes the Shutdown Risk Vehicles into something less than what Plaintiffs and other owners of Shutdown Risk Vehicles paid for and thought that they were getting. After the software update is completed, the vehicles will have reduced battery power and reduced vehicle power, all to prevent the inadequate high-voltage battery main contactor from failing. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can actually fix the problem—without degrading the performance for which Plaintiffs and members of the class paid a premium.

128. Ford has stated in NHTSA reports related to the Shutdown Risk that at least 36,000 of the 48,924 Shutdown Risk Vehicles have received the software update.

129. In every case, when an owner of a Shutdown Risk Vehicle presents their car at a dealership for the software update, or allows such an update to be

---

[26] IlliniBird, *Anybody Having Issues with Their Mach E?*, MACH E CLUB (Feb. 16, 2021), https://www.macheclub.com/threads/anybody-having-issues-with-their-mach-e.2317/

installed over the air, such vehicle has been presented for repair for purposes of Plaintiffs' express warranty claims.

130. On information and belief, some owners—justified in their unwillingness to either run the risk of shutdown or detune their high-performance Mustangs—are selling or trading them in at reduced prices because of Ford's conduct.

131. All owners and lessees of the Shutdown Risk Vehicles have suffered ascertainable loss.

**E.     All class members could have been made aware of the spontaneous Shutdown Risk at the point of sale.**

132. Plaintiffs and all putative class members were necessarily exposed to Ford's omissions before purchasing the Shutdown Risk Vehicles because they each interacted with an authorized Ford dealer at the point of sale. These dealers could have disclosed the omitted information to each class member, but they failed to do so. As a district court affirmed in another consumer class action case against Ford, all class members in that case would have "been aware of a disclosure" from Ford about the shutdown risk at the point of sale because class members "interact[ed] with an authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

## VI. CLASS ALLEGATIONS

133. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

**Nationwide Class**: All persons or entities who purchased or leased model year 2021 or 2022 Ford Mustang Mach-E vehicle that was included in Part 573 Safety Recall Report No. 22V-412 (the "Shutdown Risk Vehicles").

**Pennsylvania Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Pennsylvania.

**Pennsylvania Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Pennsylvania and who have had the recall software update completed.

**New York Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of New York.

**New York Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of New York and who have had the recall software update completed.

**Tennessee Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Tennessee.

**Tennessee Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Tennessee and who have had the recall software update completed.

**Michigan Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Michigan.

**Michigan Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Michigan and who have had the recall software update completed.

**Delaware Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Delaware.

**Delaware Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Delaware and who have had the recall software update completed.

**California Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of California.

**California Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of California and who have had the recall software update completed.

**Georgia Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Georgia.

**Georgia Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Georgia and who have had the recall software update completed.

**Indiana Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Indiana.

**Indiana Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk

Vehicles in the State of Indiana and who have had the recall software update completed.

**Louisiana Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Louisiana.

**Louisiana Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Louisiana and who have had the recall software update completed.

**Maine Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Maine.

**Maine Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Maine and who have had the recall software update completed.

**Nevada Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Nevada.

**Nevada Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of Nevada and who have had the recall software update completed.

**North Carolina Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of North Carolina.

**North Carolina Express Warranty Subclass**: All persons or entities who purchased or leased one or more of the Shutdown Risk Vehicles in the State of North Carolina and who have had the recall software update completed.

134. Plaintiffs assert claims under the laws of each state set forth below.

135. Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from any incident caused by the Shutdown Risk Vehicles. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

136. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

137. This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23. Because Ford is required by NHTSA to track the implementation of its recalls, whether a Shutdown Risk Vehicle has had the recall software update performed is ascertainable from Ford's records.

138. **<u>Numerosity</u>**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this

complaint, Plaintiffs allege that there are estimated to be at least 48,924 or more Shutdown Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

139.  **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

a.  Whether Ford engaged in the conduct alleged herein;

b.  Whether the Shutdown Risk creates an unreasonable risk of complete or partial power loss in the Shutdown Risk Vehicles;

c.  When Ford first knew about the Shutdown Risk;

d.  Whether Ford designed, manufactured, marketed, and distributed the Shutdown Risk Vehicles with component(s) that cause the Shutdown Risk;

e.  Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f.  Whether Defendant breached express warranties made to Plaintiffs and the other Class members;

g.  Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h.  Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

- 64 -

i.      Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

140. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

141. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses she seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

142. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the

- 65 -

Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. CLAIMS

The Court's prior order dismissed Counts 1-7, 9, 10, 12-14, and 16-19 of the First Amended Complaint. *See* ECF No. 23. Those counts remain in this Second Amended Complaint for appeal purposes only and are not repleaded by Plaintiffs.

**A.  Nationwide Claims**

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
**(15 U.S.C. § 2301, *et seq.*)**
**(Alleged by Plaintiffs on behalf of the Nationwide Class)**

143.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

144.  Plaintiffs bring this claim on behalf of the Nationwide Class.

145.  This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

146.   The Shutdown Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

147.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

148.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

149.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Shutdown Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

150.   Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Shutdown Risk Vehicles share a common risk in that they are all equipped

- 67 -

with a high-voltage battery main contactor that makes the vehicles susceptible to a risk of partial or complete shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk rendered the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

151. As discussed herein, on information and belief, Ford knew or should have known about the Shutdown Risk from its own durability testing of the Shutdown Risk Vehicles before launching the Shutdown Risk Vehicles. Ford omitted information about the Shutdown Risk and its consequences from Plaintiffs and Class members, misrepresented the qualities of the Shutdown Risk Vehicles, and has failed to provide a *bona fide* fix for the Shutdown Risk. Instead, Ford has instituted a software update that will depower the battery and motive power of Shutdown Risk Vehicles, potentially slowing down charging time and degrading the power and performance of the Mustang Mach-E that Ford advertised and promoted, and that Plaintiffs and the Class members thought they would have for the duration of their ownership.

152. Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Shutdown Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

153. Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

154. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Shutdown Risk Vehicles could spontaneously lose power when used as intended long before Plaintiffs and the Class. Ford failed to disclose this risk to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

155. Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Shutdown Risk Vehicles and have no rights under the warranty agreements provided with the Shutdown Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Shutdown Risk Vehicles are dangerous instrumentalities as

spontaneous shutdown presents an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles.

156. Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

157. Plaintiffs would suffer economic hardship if they returned their Shutdown Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Shutdown Risk Vehicles by retaining them.

158. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by

Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

159.  Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Shutdown Risk in their Shutdown Risk Vehicles.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**
**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

160.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

161.  Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses.

162.  A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Shutdown Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Shutdown Risk Vehicles, or (b) knowingly concealed material information in connection with the sale or lease

- 71 -

of the Shutdown Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Shutdown Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

163. Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

164. Ford sold the Shutdown Risk Vehicles to Plaintiffs without disclosing the Shutdown Risk and concealed and suppressed the risk from regulators and consumers.

165. Ford concealed and suppressed the Shutdown Risk with the intent to deceive Plaintiffs.

166. Ford did so in order to falsely assure purchasers, lessees, and owners of the Shutdown Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Mustang brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety and performance of the Shutdown Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

167. Ford had a duty to disclose the Shutdown Risk because it was known and/ only knowable by Ford; Ford had superior knowledge and access to the facts;

and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance and quality of the Shutdown Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Shutdown Risk. Having provided information to Plaintiffs, Ford had the duty to disclose not just the partial truth, but the entire truth. Finally, once the Shutdown Risk Vehicles were on the road, Ford had a duty to monitor the Shutdown Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

168.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

169.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and conceal material information regarding the Shutdown Risk. This is especially true in the context of Ford's purported "fix," which does not actually fix the defective high-voltage main battery contactor but appears instead designed to intentionally slow down charging and reduce engine power in order to prevent the Shutdown Risk from manifesting.

170.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Shutdown Risk Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated as high-performance electric vehicles worthy of the Mustang brand. Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

171.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. In purchasing or leasing their Shutdown Risk Vehicles, Plaintiffs did not get the benefit of her bargain since the vehicles were worth less than they would have been without the shutdown risk, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the risks. Those Nationwide Class members who sold their Shutdown Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed risks that existed in the Shutdown Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

172.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

173. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### UNJUST ENRICHMENT
### (COMMON LAW)
### (Alleged by Plaintiffs on behalf of the Nationwide Class)

174. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

175. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

176. This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

177. Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

178. Ford has benefitted from selling, leasing, and distributing the Shutdown Risk Vehicles for more than they were worth because of Ford's conduct

described herein, at a profit, and Plaintiffs and Nationwide Class members have overpaid for the Shutdown Risk Vehicles and been forced to pay other costs.

179.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

180.   It is inequitable for Ford to retain these benefits.

181.   Plaintiffs and the Nationwide Class were not aware of the true facts about the Shutdown Risk Vehicles and did not benefit from Ford's conduct described herein.

182.   Ford knowingly accepted the benefits of its unjust conduct.

183.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.     State-Specific Claims**

    **1.     Pennsylvania**

**COUNT IV[27]**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 Pa. Cons. Stat. § 201-1, *et seq*.)**
**(Alleged by Plaintiff Sherman**
**on behalf of the Pennsylvania Subclass)**

184.   Plaintiff Sherman and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

---

[27] This Count is not being repleaded. Two plaintiffs who voluntarily dismissed their claims in their entirety have been removed from the Count, with the remaining plaintiff's claim left in for appeal purposes only.

185.   Plaintiff Sherman brings this action on behalf of himself and the Pennsylvania Subclass.

186.   Plaintiff Sherman and the Pennsylvania Subclass members purchased or leased their Shutdown Risk Vehicles primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

187.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

188.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

189.   Ford engaged in unlawful trade practices, including representing that the Shutdown Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Shutdown Risk Vehicles are of a particular standard and quality when they are not; advertising the Shutdown Risk Vehicles with the intent not to sell them as advertised; and engaging in other

- 77 -

fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

190. In purchasing or leasing the Shutdown Risk Vehicles, Plaintiff Sherman and the Pennsylvania Subclass were deceived by Ford's failure to disclose the Shutdown Risk and misrepresentations about the Shutdown Risk Vehicles.

191. Plaintiff Sherman and the Pennsylvania Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff Sherman and the Pennsylvania Subclass members did not, and could not, unravel Ford's deception on their own.

192. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Sherman and the Pennsylvania Subclass members.

193. Ford knew or should have known that its conduct violated the Pennsylvania CPL.

194. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff Sherman and the Pennsylvania Subclass members based on (i) its own pre-sale durability testing; (ii)

the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

195.   Ford owed Plaintiff Sherman and the Pennsylvania Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

   a.   Possessed exclusive knowledge about the Shutdown Risk;

   b.   Omitted the foregoing from Plaintiff Sherman and the Pennsylvania Subclass;

   c.   Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff Sherman and the Pennsylvania Subclass that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

196.   Ford had a duty to disclose the Shutdown Risk, because, having volunteered to provide information to Plaintiff Sherman and the Pennsylvania Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Shutdown Risk Vehicles they were purchasing safe and free from serious safety defects.

197.   Plaintiff Sherman and the Pennsylvania Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or

- 79 -

leased the Shutdown Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Sherman and the Pennsylvania Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Sherman and the Pennsylvania Subclass.

198. Ford's violations of the Pennsylvania CPL present a continuing risk to Plaintiff Sherman, the Pennsylvania Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

199. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Sherman and the Pennsylvania Subclass. Had Plaintiff Sherman and the Pennsylvania Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Sherman and the Pennsylvania Subclass also suffered

ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

200. Ford is liable to Plaintiff Sherman and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a).

**COUNT V**
**VIOLATION OF EXPRESS WARRANTY**
**(13 PA. CONS. STAT. ANN. § 2313)**
**(Alleged by Plaintiffs Sherman and Spradlin**
**on behalf of the Pennsylvania Express Warranty Subclass)**

201. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

202. Plaintiffs Ira Sherman and Lisa Spradlin bring this Count on behalf of themselves and the Pennsylvania Express Warranty Subclass.

203. Ford is and was at all relevant times a merchant and seller with respect to motor vehicles.

204. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers

- 81 -

the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

205. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

206. Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

207. Plaintiffs and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

208. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

209. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that degraded the performance of the warranted vehicles.

210. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

211. Accordingly, recovery by Plaintiffs and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

212. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not

conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiffs and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

213. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiffs' and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

214. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

215. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER PENNSYLVANIA LAW
### (13 Pa. Cons. Stat. Ann. § 2314)
### (Alleged by Plaintiff Sherman and Spradlin
### on behalf of the Pennsylvania Subclass)

216. Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

217. Plaintiffs Sherman and Spradlin bring this action on behalf of themselves and the Pennsylvania Subclass.

218. Ford is a "merchant" with respect to motor vehicles.

219. Under Pennsylvania law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

220. The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

- 85 -

221.   Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass members.

222.   It was reasonable to expect that Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

223.   Ford was provided notice of these issues within a reasonable time of Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

224.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Sherman, Spradlin, and the Pennsylvania Subclass have been damaged in an amount to be determined at trial.

2.      **New York**

## COUNT VII

**VIOLATION OF EXPRESS
WARRANTY (N.Y. U.C.C. § 2-313)
(Alleged by Plaintiff van Beusekom on
behalf of the New York Express Warranty Subclass)**

225.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

226.   Plaintiff Edwin van Beusekom bring this Count on behalf of himself and the New York Express Warranty Subclass.

227.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

228.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

229.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

- 87 -

230. Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

231. Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

232. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

233. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and

instead issued only a software update that did not correct the defect, but instead only degraded the performance of the Shutdown Risk Vehicles.

234. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

235. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

236. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

237. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

238. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

239. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT VIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW YORK LAW
### (N.Y. U.C.C. § 2-314)
### (Alleged by Plaintiff van Beusekom
### on behalf of the New York Subclass)

240. Plaintiff Edwin van Beusekom and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 90 -

241. Plaintiff Edwin van Beusekom brings this action on behalf of himself and the New York Subclass.

242. Ford is a "merchant" with respect to motor vehicles.

243. Under New York law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

244. The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

245. Plaintiff van Beusekom and the New York Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Edwin van Beusekom and the New York Subclass members.

246. It was reasonable to expect that Plaintiff van Beusekom and the New York Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

247. Ford was provided notice of these issues within a reasonable time of Plaintiff van Beusekom and the New York Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

248. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff van Beusekom and the New York Subclass members have been damaged in an amount to be determined at trial.

**3.      Tennessee**

**COUNT IX**

**VIOLATION OF EXPRESS WARRANTY**
**(TENNESSEE CODE § 47-2-313)**
**(Alleged by Plaintiff Hall on behalf of the**
**Tennessee Express Warranty Subclass)**

249. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

250. Plaintiff Darrell Hall bring this Count on behalf of himself and the Tennessee Express Warranty Subclass.

251. Ford is and was at all relevant times a merchant with respect to motor vehicles.

252. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

253. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

254. Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

255. Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiff and Subclass members that the Shutdown Risk Vehicles were defectively designed

and failed to fix the defectively designed high-voltage battery main contactor free of charge.

256. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

257. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that did not address the defective high-voltage battery main contactors.

258. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy

the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

259. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

260. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

261. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiff and the other Subclass members whole.

262. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

263. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT X

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER TENNESSEE LAW
(TENNESSEE CODE § 47-2-314)
(Alleged by Plaintiff Hall
on behalf of the Tennessee Subclass)

264. Plaintiff Hall and the Tennessee Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

265. Plaintiff Hall brings this action on behalf of himself and the Tennessee Subclass.

266. Ford is a "merchant" with respect to motor vehicles.

267. Under Tennessee law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

268. The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk

Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

269.   Plaintiff Hall and the Tennessee Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Darrell Hall and the Tennessee Subclass members.

270.   It was reasonable to expect that Plaintiff Hall and the Tennessee Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

271.   Ford was provided notice of these issues within a reasonable time of Plaintiff Hall and the Tennessee Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

272. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Hall and the Tennessee Subclass members have been damaged in an amount to be determined at trial.

**4. Michigan**

## COUNT XI

**VIOLATION OF EXPRESS WARRANTY**
**(MICH. COMP. LAWS ANN.440.2313 AND 440.2860)**
**(Alleged by Plaintiff Shuster on behalf of the**
**Michigan Express Warranty Subclass)**

273. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

274. Plaintiff Sanford Shuster brings this Count on behalf of himself and the Michigan Express Warranty Subclass.

275. Ford is and was at all relevant times a merchant with respect to motor vehicles.

276. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers

the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

277. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

278. Ford's warranties formed the basis of the bargain that was reached when Plaintiff and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

279. Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiff and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

280. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

281. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that did nothing to correct the defective high-voltage battery main contactors.

282. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

283. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

284. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not

conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

285. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiff and the other Subclass members whole.

286. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

287. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT XII

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER MICHIGAN LAW
## (MICH. COMP. LAWS ANN.440.2314 AND 440.2862)
### (Alleged by Plaintiff Shuster
### on behalf of the Michigan Subclass)

288.   Plaintiff Shuster and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

289.   Plaintiff Shuster brings this action on behalf of himself and the Michigan Subclass.

290.   Ford is a "merchant" with respect to motor vehicles.

291.   Under Michigan law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

292.   The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

293. Plaintiff Shuster and the Michigan Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Sanford Shuster and the Michigan Subclass members.

294. It was reasonable to expect that Plaintiff Shuster and the Michigan Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

295. Ford was provided notice of these issues within a reasonable time of Plaintiff Sanford Shuster and the Michigan Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

296. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Shuster and the Michigan Subclass members have been damaged in an amount to be determined at trial.

5.      **Delaware**

## COUNT XIII

### VIOLATION OF EXPRESS WARRANTY
### (6 DE Code § 2-313)
### (Alleged by Plaintiff Clough on behalf of the
### Delaware Express Warranty Subclass)

297.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

298.    Plaintiff Norman Clough brings this Count on behalf of himself and the Delaware Express Warranty Subclass.

299.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

300.    In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

301.    As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

302.   Ford's warranties formed the basis of the bargain that was reached when Plaintiff and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

303.   Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

304.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

305.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and

- 105 -

instead issued an ineffective software update that does nothing to correct the defective high-voltage main battery contactor.

306.    Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

307.    Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

308.    Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

309. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

310. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

311. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT XIV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER DELAWARE LAW
### (6 DE Code § 2-314)
### (Alleged by Plaintiff Clough
### on behalf of the Delaware Subclass)

312. Plaintiff Clough and the Delaware Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

313. Plaintiff Clough brings this action on behalf of himself and the Delaware Subclass.

314. Ford is a "merchant" with respect to motor vehicles.

315. Under Delaware law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

316. The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

317. Plaintiff Clough and the Delaware Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Clough and the Delaware Subclass members.

318. It was reasonable to expect that Plaintiff Clough and the Delaware Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

319. Ford was provided notice of these issues within a reasonable time of Plaintiff Clough and the Delaware Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

320. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Clough and the Delaware Subclass members have been damaged in an amount to be determined at trial.

**6.    California**

**COUNT XV**

**VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, et seq.)
(Alleged by Plaintiffs Dorobiala, Kleiner, and Orlando
on behalf of the California Subclass)**

321. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

322. Plaintiffs Dorobiala, Kleiner, and Orlando bring this action on behalf of themselves and the California Subclass.

323. Ford is a person as defined in California Civil Code § 1761(c).

324. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members are consumers as defined in California Civil Code § 1761(d).

325. Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described herein, and by omitting the Shutdown Risk and misrepresenting and misleading Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass about the Shutdown Risk Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Shutdown Risk. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

326. Ford knew or should have known that its conduct violated the CLRA.

327. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

328. In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

329. Ford owed Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Shutdown Risk;

    b.    Omitted the foregoing from Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material

facts from Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

330.   In failing to disclose the Shutdown Risk and the associated safety risks and repair costs that result from it, Ford has misrepresented the Shutdown Risk Vehicles, omitted to disclose the Shutdown Risk, and breached its duty to disclose.

331.   The facts omitted and misrepresented by Ford to Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Shutdown Risk Vehicles or to pay a lesser price. Had Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members known about the defective nature of the Shutdown Risk Vehicles, they would not have purchased or leased the Shutdown Risk Vehicles or would have paid less for them.

332.   On or about July 20, 2022, Plaintiff's undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Shutdown Risk Vehicles.

333.   Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

334.   Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass

members seek all relief available under the CLRA, including equitable relief,

damages, and attorneys' fees.

**COUNT XVI**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**
**(Alleged by Plaintiffs Dorobiala, Kleiner, and Orlando**
**on behalf of the California Subclass)**

335.   Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass

reallege and incorporate by reference all paragraphs as though fully set forth

herein.

336.   Plaintiffs Dorobiala, Kleiner, and Orlando bring this claim on behalf

of themselves and the California Subclass.

337.   The California Unfair Competition Law ("UCL") prohibits acts of

"unfair competition," including any "unlawful, unfair or fraudulent business act or

practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. &

Prof. Code § 17200.

338.   In the course of its business, Ford engaged in deceptive acts or

practices with the marketing and sale or lease of the Shutdown Risk Vehicles

because it misrepresented and omitted material facts concerning the Shutdown

Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein.

Ford omitted the fact of the Shutdown Risk from Plaintiffs Dorobiala, Kleiner,

- 113 -

Orlando, and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

339.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Shutdown Risk in the Shutdown Risk Vehicles from Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the Shutdown Risk. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Shutdown Risk, and Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Shutdown Risk.

340.   The Shutdown Risk causes the Shutdown Vehicles to suddenly shut down, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

341.   Ford's acts and practices mislead and deceived Plaintiffs Dorobiala, Kleiner, and Orlando, and are likely to deceive the public. In failing to disclose the Shutdown Risk and omitting other material facts from Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members, Ford breached its duty to

disclose these facts, violated the UCL, and caused injuries to Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members, as it would have been to all reasonable consumers.

342. The injuries suffered by Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members could or should have reasonably avoided.

343. Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

344. Plaintiffs Dorobiala, Kleiner, Orlando, and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

345. Plaintiffs Dorobiala, Kleiner, and Orlando seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT XVII

## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW
(Cal. Civ. Code §§ 1791.1 & 1792)
(Alleged by Plaintiffs Dorobiala, Kleiner, and Orlando on behalf of the California Subclass)

346. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

347. Plaintiffs Dorobiala, Kleiner, and Orlando bring this claim on behalf of themselves and the California Subclass.

348. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

349. The Shutdown Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

350. Ford is the "manufacturer" of the Shutdown Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

351. Ford impliedly warranted to Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass that the Shutdown Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Shutdown Risk Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

- 116 -

352.   Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

353.   The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

354.   Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass were and are third-party beneficiaries of Ford's contracts with Ford-

certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members.

355. It was reasonable to expect that Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

356. Notice of breach is not required because Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiff's counsel sent notification to Ford on or about July 20, 2022.

357. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Shutdown Risk Vehicles to Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members.

358. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Shutdown Risk Vehicles.

359. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Shutdown Risk Vehicles, or the overpayment or diminution in value of their Shutdown Risk Vehicles.

360. Under Cal. Civ. Code § 1794, Plaintiffs Dorobiala, Kleiner, Orlando, and the California Subclass members are entitled to costs and attorneys' fees.

## COUNT XVIII

### VIOLATION OF EXPRESS WARRANTY
### (Cal. Civ. Code § 1791.2)

### (Alleged by Plaintiffs Dorobiala, Kleiner, and Orlando on behalf of the California Express Warranty Subclass)

361. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

362. Plaintiffs Dorobiala, Kleiner, and Orlando bring this Count on behalf of themselves and the California Express Warranty Subclass.

363. Ford is and was at all relevant times a merchant with respect to motor vehicles.

364. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for

- 119 -

a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

365. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

366. Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

367. Plaintiffs and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

368. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the

- 120 -

Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

369. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that does nothing to correct the defective high-voltage main battery contactor.

370. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

371. Accordingly, recovery by Plaintiffs and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a

manufacturing defect, and Plaintiffs, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

372. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiffs and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

373. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiffs' and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

374. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

- 122 -

375. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Subclass members have been damaged in an amount to be determined at trial.

**7.     Georgia**

### COUNT XIX

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(Ga. Code Ann. § 10-1-390, *et seq.*)**
**(Alleged by Plaintiff Myers on behalf of the Georgia Subclass)**

376. Plaintiff Myers and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

377. Plaintiff Myers brings this action on behalf of himself and the Georgia Subclass.

378. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

379.   In the course of its business, Ford violated the Georgia FBPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from Plaintiff and the Georgia Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

380.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Shutdown Risk Vehicles to Plaintiff and the Georgia Subclass.

381.   By failing to disclose and omitting the Shutdown Risk in the Shutdown Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

382.   The Shutdown Risk would be material to a reasonable consumer, such as the Georgia Subclass, and is material to Plaintiff.

383.   Ford's deceptive act or practices described herein concerning the Shutdown Risk and the Shutdown Risk Vehicles were likely to deceive or mislead

a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Georgia Subclass, and did in fact deceive and mislead Plaintiff.

384.   Ford failed to disclose material information about the Shutdown Risk and the Shutdown Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Georgia Subclass, were unaware. Ford's failure to disclose this material information about the Shutdown Risk and the Shutdown Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Georgia Subclass, and did in fact deceive and mislead Plaintiff.

385.   Plaintiff could not have discovered the existence of the Shutdown Risk, or Ford's deception and responsibility for the Shutdown Risk, until shortly before this class action was commenced.

386.   Ford knew or should have known that its conduct violated the Georgia FBPA.

387.   Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff and the Georgia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

388. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Shutdown Risk Vehicles that were either false or misleading.

389. Ford owed Plaintiff and the Georgia Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

a. Possessed exclusive knowledge about the Shutdown Risk;

b. Omitted the foregoing from Plaintiff and the Georgia Subclass;

c. Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff and the Georgia Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

390. Because Ford omitted the Shutdown Risk, Plaintiff and the Georgia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Shutdown Risk. Had Plaintiff and the Georgia Subclass been aware of the Shutdown Risk in their vehicles, they would have either not have bought their Shutdown Risk Vehicles or would have paid less for them.

391. Ford's violations of the Georgia FBPA present a continuing risk to Plaintiff, the Georgia Subclass, and the public. In particular and as alleged herein,

- 126 -

Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

392.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Georgia Subclass. Had Plaintiff and the Georgia Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Georgia Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

393.   Because Ford omitted the Shutdown Risk, Plaintiff and the Georgia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Shutdown Risk. Had Plaintiff and the Georgia Subclass been aware of the Shutdown Risk in their vehicles, they would have either not bought their Shutdown Vehicles or paid less for them.

394.   On or about July 20, 2022, Plaintiffs' counsel sent a letter complying with Ga. Code Ann § 10-1-399(b). Because Ford failed to remedy its unlawful

- 127 -

conduct within the requisite period, Plaintiff and the Georgia Subclass seek all damages and relief to which they are entitled.

## COUNT XX

### VIOLATION OF GEORGIA'S UNIFORM
### DECEPTIVE TRADE PRACTICES ACT
### (Ga. Code Ann. § 10-1-370, *et seq.*)
### (Alleged by Plaintiff Myers on behalf of the Georgia Subclass)

395.   Plaintiff Myers and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

396.   Plaintiff Myers brings this action on behalf of himself and the Georgia Subclass.

397.   Ford, Plaintiff, and the Georgia Subclass members are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

398.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). By systematically concealing the defects in the Shutdown Risk Vehicles, Ford engaged in deceptive trade practices prohibited by the Georgia UDTPA.

399.   Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

- 128 -

400. In the course of its business, Ford violated the Georgia UDTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from Plaintiff and the Georgia Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

401. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Shutdown Risk Vehicles to Plaintiff and the Georgia Subclass.

402. By failing to disclose and omitting the Shutdown Risk in the Shutdown Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Georgia UDTPA.

403. The Shutdown Risk would be material to a reasonable consumer, such as the Georgia Subclass, and is material to Plaintiff.

404. Ford's deceptive act or practices described herein concerning the Shutdown Risk and the Shutdown Risk Vehicles were likely to deceive or mislead

a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Georgia Subclass, and did in fact deceive and mislead Plaintiff.

405. Ford failed to disclose material information about the Shutdown Risk and the Shutdown Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Georgia Subclass, were unaware. Ford's failure to disclose this material information about the Shutdown Risk and the Shutdown Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Georgia Subclass, and did in fact deceive and mislead Plaintiff.

406. Plaintiff could not have discovered the existence of the Shutdown Risk, or Ford's deception and responsibility for the Shutdown Risk, until shortly before this class action was commenced.

407. Ford knew or should have known that its conduct violated the Georgia UDTPA.

408. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff and the Georgia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

409.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Shutdown Risk Vehicles that were either false or misleading.

410.   Ford owed Plaintiff and the Georgia Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Shutdown Risk;

    b.    Omitted the foregoing from Plaintiff and the Georgia Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff and the Georgia Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

411.   Because Ford omitted the Shutdown Risk, Plaintiff and the Georgia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Shutdown Risk. Had Plaintiff and the Georgia Subclass been aware of the Shutdown Risk in their vehicles, they would have either not bought their Shutdown Risk Vehicles or paid less for them.

412.   Ford's violations of the Georgia UDTPA present a continuing risk to Plaintiff, the Georgia Subclass, and the public. In particular and as alleged herein,

- 131 -

Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

413. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Georgia Subclass. Had Plaintiff and the Georgia Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Georgia Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

414. Plaintiff and the Georgia Subclass seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA under Ga. Code Ann. § 10-1-373.

- 132 -

## COUNT XXI

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER GEORGIA LAW
### (Ga. Code Ann. § 11-2-314(1))
### (Alleged by Plaintiff Myers on behalf of the Georgia Subclass)

415.   Plaintiff and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

416.   Plaintiff brings this action on behalf of himself and the Georgia Subclass.

417.   Ford is a "merchant" within the meaning of Ga. Code Ann. § 11-2- and Ga. Code Ann. § 11-2-104(1), and a "seller" of motor vehicles within the meaning of Ga. Code Ann. § 11-2-103(1)(d).

418.   Under Georgia law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles. Ga. Code Ann. § 11-2-314(1).

419.   The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The

Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

420.   Plaintiff and the Georgia Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff and the Georgia Subclass members.

421.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Georgia Subclass have been damaged in an amount to be determined at trial.

## COUNT XXII

### VIOLATION OF EXPRESS WARRANTY
### (GA. CODE ANN. § 11-2-313)
### (Alleged by Plaintiff Myers on behalf of the
### Georgia Express Warranty Subclass)

422.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

423.   Plaintiff Myers brings this Count on behalf of himself and the Georgia Express Warranty Subclass.

424.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

425.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides

- 134 -

a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

426. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

427. Ford's warranties formed the basis of the bargain that was reached when Plaintiff and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

428. Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiff and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

429. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued

a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

430. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead an ineffective software update that does nothing to correct the defective high-voltage main battery contactor.

431. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

432. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a

manufacturing defect, and Plaintiffs, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

433. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

434. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiff and the other Subclass members whole.

435. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

436. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

**8.    Indiana**

## COUNT XXIII

**VIOLATION OF THE INDIANA DECEPTIVE SALES PRACTICES ACT**
**(Ind. Code § 24-5, *et seq.*)**
**(Alleged by Plaintiff Petrusic on behalf of the Indiana Subclass)**

437.   Plaintiff Petrusic and the Indiana Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

438.   Plaintiff Petrusic brings this action on behalf of himself and the Indiana Subclass.

439.   Ford is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

440.   Plaintiff Petrusic's and the Indiana Subclass' vehicle purchases were "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

441.   Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or

- 138 -

connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." By systematically concealing the defects in the Shutdown Risk Vehicles, Ford engaged in deceptive trade practices prohibited by the Indiana DCSA.

442. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

443. In the course of its business, Ford violated the Indiana DCSA and engaged in deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from

Plaintiff and the Indiana Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

444. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Shutdown Risk Vehicles to Plaintiff and the Indiana Subclass.

445. By failing to disclose and omitting the Shutdown Risk in the Shutdown Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Indiana DCSA.

446. The Shutdown Risk would be material to a reasonable consumer, such as the Indiana Subclass, and is material to Plaintiff.

447. Ford's deceptive act or practices described herein concerning the Shutdown Risk and the Shutdown Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Indiana Subclass, and did in fact deceive and mislead Plaintiff.

448. Ford failed to disclose material information about the Shutdown Risk and the Shutdown Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Indiana Subclass, were unaware. Ford's failure to disclose this material information about the Shutdown Risk and the Shutdown Risk

- 140 -

Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Indiana Subclass, and did in fact deceive and mislead Plaintiff.

449. Plaintiff could not have discovered the existence of the Shutdown Risk, or Ford's deception and responsibility for the Shutdown Risk, until shortly before this class action was commenced.

450. Ford knew or should have known that its conduct violated the Indiana DCSA.

451. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff and the Indiana Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

452. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Shutdown Risk Vehicles that were either false or misleading.

453. Ford owed Plaintiff and the Indiana Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

      a.    Possessed exclusive knowledge about the Shutdown Risk;

- 141 -

b.    Omitted the foregoing from Plaintiff and the Indiana Subclass;

c.    Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff and the Indiana Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

454.   Because Ford omitted the Shutdown Risk, Plaintiff and the Indiana Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Shutdown Risk. Had Plaintiff and the Indiana Subclass been aware of the Shutdown Risk in their vehicles, they would have either not bought their Shutdown Risk Vehicles or paid less for them.

455.   Ford's violations of the Indiana DCSA present a continuing risk to Plaintiff, the Indiana Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

456.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Indiana Subclass. Had Plaintiff and the Indiana Subclass members known

the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Indiana Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

457. Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Indiana Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for Defendants' willfully deceptive acts, and any other just and proper relief available under the Indiana DCSA.

## COUNT XXIV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER INDIANA LAW
### (Ind. Code § 26-1-2-314)
### (Alleged by Plaintiffs Petrusic and Goshorn
### on behalf of the Indiana Subclass)

458. Plaintiffs and the Indiana Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

459. Plaintiffs bring this action on behalf of themselves and the Indiana Subclass.

460.   Ford is a merchant with respect to motor vehicles within the meaning of Ind. Code § 26-1-2-314.

461.   Under Ind. Code § 26-1-2-314, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

462.   The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

463.   Plaintiffs and the Indiana Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff and the Indiana Subclass members.

464.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Indiana Subclass have been damaged in an amount to be determined at trial.

## COUNT XXV

### VIOLATION OF EXPRESS
### WARRANTY (IN Code § 26-1-2-313)
### (Alleged by Plaintiffs Petrusic and Goshorn
### on behalf of the Indiana Express Warranty Subclass)

465. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

466. Plaintiffs Josip Petrusic and Brad Goshorn bring this Count on behalf of themselves and the Indiana Express Warranty Subclass.

467. Ford is and was at all relevant times a merchant with respect to motor vehicles.

468. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

469. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

470.   Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

471.   Plaintiffs and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

472.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

473.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and

- 146 -

instead issued an ineffective software update that does nothing to correct the defective high-voltage main battery contactor.

474. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

475. Accordingly, recovery by Plaintiffs and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

476. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiffs and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

- 147 -

477. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiffs' and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

478. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

479. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Subclass members have been damaged in an amount to be determined at trial.

**9.    Louisiana**

**COUNT XXVI**

**VIOLATION OF EXPRESS WARRANTY**
**(LA Rev Stat § 9:2800.51, *et seq*.)**
**(Alleged by Plaintiff Caton on behalf**
**of the Louisiana Express Warranty Subclass)**

480. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

481.   Plaintiff Adam Caton brings this Count on behalf of himself and the Louisiana Express Warranty Subclass.

482.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

483.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

484.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

485.   Ford's warranties formed the basis of the bargain that was reached when Plaintiff and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

486.   Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform

Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

487. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

488. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that has done nothing to repair the defective high-voltage battery main contactor.

489. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a

reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

490. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

491. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

492. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time,

any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

493.   Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

494.   As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXVII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER LOUISIANNA LAW (LA. CIV. CODE ART. 2475, 2520, 2524) (Alleged by Plaintiff Caton on behalf of the Louisianna Subclass)

495.   Plaintiff Caton and the Louisianna Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

496.   Plaintiff Caton brings this action on behalf of himself and the Louisianna Subclass.

497.   Ford is a "merchant" with respect to motor vehicles.

498.   Under Louisianna law, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

499. The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

500. Plaintiff Adam Caton and the Louisianna Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Caton and the Louisianna Subclass members.

501. It was reasonable to expect that Plaintiff Caton and the Louisianna Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

502. Ford was provided notice of these issues within a reasonable time of Plaintiff Caton and the Louisianna Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is

the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

503. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Caton and the Louisianna Subclass members have been damaged in an amount to be determined at trial.

**10. Maine**

## COUNT XXVIII

**VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT**
**(Me. Rev. Stat. Ann. tit. 5, § 205-A *et seq.*)**
**(Alleged by Plaintiff Rothwell on behalf of the Maine Subclass)**

504. Plaintiff Rothwell and the Maine Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

505. Plaintiff Rothwell brings this action on behalf of himself and the Maine Subclass.

506. Ford, Plaintiff, and the Maine Subclass members are "persons" within the meaning of meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

507. The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207.

508. Ford, Plaintiff, and Maine Subclass members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

- 154 -

509. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

510. In the course of its business, Ford violated the Maine UTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from Plaintiff and the Maine Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

511. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Shutdown Risk Vehicles to Plaintiff and the Maine Subclass.

512. By failing to disclose and omitting the Shutdown Risk in the Shutdown Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Maine UTPA.

513. The Shutdown Risk would be material to a reasonable consumer, such as the Maine Subclass, and is material to Plaintiff.

- 155 -

514. Ford's deceptive act or practices described herein concerning the Shutdown Risk and the Shutdown Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Maine Subclass, and did in fact deceive and mislead Plaintiff.

515. Ford failed to disclose material information about the Shutdown Risk and the Shutdown Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Maine Subclass, were unaware. Ford's failure to disclose this material information about the Shutdown Risk and the Shutdown Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Maine Subclass, and did in fact deceive and mislead Plaintiff.

516. Plaintiff could not have discovered the existence of the Shutdown Risk, or Ford's deception and responsibility for the Shutdown Risk, until shortly before this class action was commenced.

517. Ford knew or should have known that its conduct violated the Maine UTPA.

518. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff and the Maine Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty

claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

519. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Shutdown Risk Vehicles that were either false or misleading.

520. Ford owed Plaintiff and the Maine Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

a. Possessed exclusive knowledge about the Shutdown Risk;

b. Omitted the foregoing from Plaintiff and the Maine Subclass;

c. Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff and the Maine Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

521. Because Ford omitted the Shutdown Risk, Plaintiff and the Maine Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Shutdown Risk. Had Plaintiff and the Maine Subclass been aware of the Shutdown Risk in their vehicles, they would have either not bought their Shutdown Risk Vehicles or paid less for them.

522. Ford's violations of the Maine UTPA present a continuing risk to Plaintiff, the Maine Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

523. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Maine Subclass. Had Plaintiff and the Maine Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Maine Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

524. Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213(2), Plaintiff and the Class seek costs, attorneys' fees, and any other just and proper relief under applicable law.

525. On July 20, 2022, in accordance with Me. Rev. Stat. Ann. tit. 5, § 213(1-A), Plaintiffs' counsel, on behalf of Plaintiff and the Maine Subclass, sent a letter to Ford with notice of their allegations regarding Ford's violations of the

Maine UTPA relating to the Shutdown Risk Vehicles and Plaintiffs' demand that Ford correct or agree to correct the actions described therein. More than thirty days have passed since Plaintiffs' counsel sent that letter and Ford has failed to correct or agree to correct the actions described therein. Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and the Maine Subclass are entitled.

## COUNT XXIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MAINE LAW
### (Me. Rev. Stat. Ann. tit. § 2-314)
### (Alleged by Plaintiff Rothwell on behalf of the Maine Subclass)

526.    Plaintiff and the Maine Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

527.    Plaintiff brings this action on behalf of himself and the Maine Subclass.

528.    Ford is a merchant with respect to motor vehicles within the meaning of Me. Rev. Stat. Ann. tit. 11, § 2-104(1).

529.    Under Me. Rev. Stat. Ann. tit. § 2-314, an implied warranty of merchantability attaches to the Shutdown Risk Vehicles.

530.    The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk

Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

531. Plaintiff and the Maine Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff and the Maine Subclass members.

532. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Maine Subclass have been damaged in an amount to be determined at trial.

## COUNT XXX

**VIOLATION OF EXPRESS WARRANTY**
**(Me. Rev. Stat. Ann. tit. § 2-313)**
**(Alleged by Plaintiff Rothwell on behalf**
**of the Maine Express Warranty Subclass)**

533. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

534. Plaintiff Rothwell brings this Count on behalf of himself and the Maine Express Warranty Subclass.

535.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

536.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

537.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

538.   Ford's warranties formed the basis of the bargain that was reached when Plaintiff and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

539. Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiff and Subclass members that the Shutdown Risk Vehicles were defectively designed

and failed to fix the defectively designed high-voltage battery main contactor free of charge.

540. Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

541. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and instead issued an ineffective software update that has done nothing to repair the defective high-voltage battery main contactor.

542. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy

- 162 -

the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

543. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Subclass members, seek all remedies as allowed by law.

544. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

545. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiff and the other Subclass members whole.

546. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

547. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

**11.    Nevada**

**COUNT XXXI**

**VIOLATION OF THE NEVADA
DECEPTIVE TRADE PRACTICES ACT
(Nev. Rev. Stat. § 598.0903 *et seq.*)
(Alleged by Plaintiff Pettiford on behalf of the Nevada Subclass)**

548.    Plaintiff Pettiford and the Nevada Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

549.    Plaintiff Pettiford brings this action on behalf of himself and the Nevada Subclass.

550.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or

- 164 -

connection of a person therewith"; "[r]epresents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "[a]dvertises goods or services with intent not to sell or lease them as advertised and certified"; or "[k]nowingly makes any other false representation in a transaction." Nev. Rev. Stat. §§ 598.0915–598.0925.

551.   Ford engaged in unlawful trade practices that violated the Nevada DTPA, including representing that the Shutdown Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Shutdown Risk Vehicles are of a particular standard and quality when they are not; advertising the Shutdown Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

552.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

553.   In purchasing or leasing the Shutdown Risk Vehicles, Plaintiff Pettiford and the Nevada Subclass were deceived by Ford's failure to disclose the Shutdown Risk and misrepresentations about the Shutdown Risk Vehicles.

554.   Plaintiff Pettiford and the Nevada Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of

knowing that Ford's representations were false and misleading. Plaintiff Pettiford and the Nevada Subclass members did not, and could not, unravel Ford's deception on their own.

555.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Pettiford and the Nevada Subclass members.

556.   Ford knew or should have known that its conduct violated the Nevada DTPA.

557.   Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff Pettiford and the Nevada Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

558.   Ford owed Plaintiff Pettiford and the Nevada Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

  a.   Possessed exclusive knowledge about the Shutdown Risk;

  b.   Omitted the foregoing from Plaintiff Pettiford and the Nevada Subclass;

  c.   Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material

        facts from Plaintiff Pettiford and the Nevada Subclass that contradicted these representations; and/or

    d.     Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

559. Ford had a duty to disclose the Shutdown Risk, because, having volunteered to provide information to Plaintiff Pettiford and the Nevada Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Shutdown Risk Vehicles they were purchasing safe and free from serious safety defects.

560. Plaintiff Pettiford and the Nevada Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Shutdown Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Pettiford and the Nevada Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Pettiford and the Nevada Subclass.

561. Ford's violations of the Nevada DTPA present a continuing risk to Plaintiff Pettiford, the Nevada Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has

- 167 -

also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

562. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Pettiford, and the Nevada Subclass. Had Plaintiff Pettiford and the Nevada Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Pettiford and the Nevada Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

563. Accordingly, Plaintiff and the Nevada Subclass seek their actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

## COUNT XXXII

### VIOLATION OF EXPRESS WARRANTY
(Nev. Rev. Stat. § 104.2313)
(Alleged by Plaintiff Pettiford on behalf of the
Nevada Express Warranty Subclass)

564. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

565. Plaintiff Pettiford bring this Count on behalf of himself and the Nevada Express Warranty Subclass.

566. Ford is and was at all relevant times a merchant with respect to motor vehicles.

567. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

568. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

- 169 -

569.   Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

570.   Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

571.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

572.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and

instead issued an ineffective software update that has done nothing to repair the defective high-voltage battery main contactor.

573. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

574. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

575. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

576. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

577. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

578. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

**COUNT XXXIII**

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER
NEVADA LAW (Nev. Rev. Stat. § 104.2314)
(Alleged by Plaintiff Pettiford on behalf
of the Nevada Subclass)**

579. Plaintiff Pettiford and the Nevada Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 172 -

580.   Plaintiff Pettiford brings this action on behalf of himself and the Nevada Subclass.

581.   Ford manufactured and distributed Shutdown Risk Vehicles throughout the United States for sale to Plaintiff and Nevada Subclass members.

582.   Ford impliedly warranted to Plaintiff and Nevada Subclass members that their vehicles were free from defects and were merchantable and fit for their ordinary purpose.

583.   The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

584.   Plaintiff Pettiford and the Nevada Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Shutdown Risk Vehicles to Plaintiff Pettiford and the Nevada Subclass members.

585.   It was reasonable to expect that Plaintiff Pettiford and the Nevada Subclass members would use, consume, or be affected by the Shutdown Risk Vehicles.

586.   Ford was provided notice of these issues within a reasonable time of Plaintiff Pettiford and the Nevada Subclass members' knowledge of the non-conforming or defective nature of the Shutdown Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Shutdown Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

587.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Pettiford and the Nevada Subclass have been damaged in an amount to be determined at trial.

**12.   North Carolina**

**COUNT XXXIV**

**VIOLATION OF NORTH CAROLINA'S UNFAIR AND
DECEPTIVE ACTS AND PRACTICES ACT
(N.C. Gen. Stat. § 75-1.1, *et seq.*)
(Alleged by Plaintiff Gutierrez on behalf of the North Carolina Subclass)**

588.   Plaintiff Gutierrez and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

589.   Plaintiff Gutierrez brings this action on behalf of himself and the North Carolina Subclass.

- 174 -

590. Ford engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

591. N.C. Gen. Stat. § 75-1.1, *et seq.* (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." As alleged herein, Ford committed unfair or deceptive acts or practices in violation of the North Carolina Act.

592. In the course of its business, Ford violated the North Carolina Act and engaged in unfair and deceptive acts or practices with the marketing and sale or lease of the Shutdown Risk Vehicles because it misrepresented and omitted material facts concerning the Shutdown Risk Vehicles, specifically the existence of the Shutdown Risk, as alleged herein. Ford omitted the fact of the Shutdown Risk from Plaintiff Gutierrez and the North Carolina Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Shutdown Risk Vehicles given the existence of the Shutdown Risk in them.

593. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Shutdown Risk Vehicles to Plaintiff Gutierrez and the North Carolina Subclass.

594. By failing to disclose and omitting the Shutdown Risk in the Shutdown Risk Vehicles, which it marketed as safe, reliable, of high quality, and

safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the North Carolina Act

595. The Shutdown Risk would be material to a reasonable consumer, such as the North Carolina Subclass, and is material to Plaintiff Gutierrez.

596. Ford's deceptive act or practices described herein concerning the Shutdown Risk and the Shutdown Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Gutierrez and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Gutierrez.

597. Ford failed to disclose material information about the Shutdown Risk and the Shutdown Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff Gutierrez and the North Carolina Subclass, were unaware. Ford's failure to disclose this material information about the Shutdown Risk and the Shutdown Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Gutierrez and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Gutierrez.

598. Plaintiff Gutierrez could not have discovered the existence of the Shutdown Risk, or Ford's deception and responsibility for the Shutdown Risk, until shortly before this class action was commenced.

599. Ford knew or should have known that its conduct violated the North Carolina Act.

600. Ford knew or should have known about the Shutdown Risk affecting the Shutdown Risk Vehicles owned or leased by Plaintiff Gutierrez and the North Carolina Subclass members based on (i) its own pre-sale durability testing; (ii) the direct warranty claims in 286 Shutdown Risk Vehicles; and (iii) Ford's own investigation of shutdowns in the Shutdown Risk Vehicles.

601. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Shutdown Risk Vehicles that were either false or misleading.

602. Ford owed Plaintiff Gutierrez and the North Carolina Subclass a duty to disclose the true safety, performance, and reliability of the Shutdown Risk Vehicles because Ford:

a.    Possessed exclusive knowledge about the Shutdown Risk;

b.    Omitted the foregoing from Plaintiff Gutierrez and the North Carolina Subclass;

c.    Made misleading and incomplete representations about the safety, quality, high-performance, functionality, and reliability of the Shutdown Risk Vehicles, while withholding material facts from Plaintiff Gutierrez and the North Carolina Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy of the Shutdown Risk.

603. Ford had a duty to disclose the Shutdown Risk, because, having volunteered to provide information to Plaintiff Gutierrez and the North Carolina Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Shutdown Risk Vehicles they were purchasing safe and free from serious safety defects.

604. Plaintiff Gutierrez and the North Carolina Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Shutdown Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Gutierrez and the North Carolina Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Gutierrez and the North Carolina Subclass.

605. Ford's violations of the North Carolina Act present a continuing risk to Plaintiff Gutierrez, the North Carolina Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a *bona fide* fix for the Shutdown Risk. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing shutdown risk to those on the road in or around the Shutdown

Risk Vehicles. Ford's deceptive acts and practices complained of herein affect the public interest.

606.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Gutierrez and the North Carolina Subclass. Had Plaintiff Gutierrez and the North Carolina Subclass members known the truth about the Shutdown Risk and/or Ford's proposed fix, which will degrade the performance of their Mustangs, they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Gutierrez and the North Carolina Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Shutdown Risk Vehicles.

607.   Because Ford's deceptive acts and practices caused injury to Plaintiff Gutierrez and the North Carolina Subclass, they seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act.

## COUNT XXXV

**VIOLATION OF EXPRESS WARRANTY**
**(N.C. Gen. Stat. § 25-2-313)**
**(Alleged by Plaintiff Gutierrez on**
**behalf of the North Carolina Express**
**Warranty Subclass)**

608. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

609. Plaintiff Eddie Gutierrez bring this Count on behalf of himself and the North Carolina Express Warranty Subclass.

610. Ford is and was at all relevant times a merchant with respect to motor vehicles.

611. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. Ford also provides a Powertrain Warranty that provides coverage for five years or 60,000 miles, whichever occurs first, for the Shutdown Risk Vehicles. Additionally, Ford provides a Hybrid/Electric Unique Component Coverage warranty, which covers the Mustang Mach-E's unique electrical components, that provides coverage for eight years or 100,000 miles, whichever occurs first.

612. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Shutdown Risk Vehicles.

613.   Ford's warranties formed the basis of the bargain that was reached when Plaintiffs and other Subclass members purchased or leased their Shutdown Risk Vehicles equipped with the defectively designed high-voltage battery main contactor.

614.   Plaintiff and the Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and Subclass members that the Shutdown Risk Vehicles were defectively designed and failed to fix the defectively designed high-voltage battery main contactor free of charge.

615.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Shutdown Risk Vehicles' materials and workmanship defects. Instead, it has issued a software update that degrades the Shutdown Risk Vehicles, rendering them less powerful and causing them to take longer to charge. This update is not a repair at all.

616.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, the Shutdown Risk Vehicles have been presented to Ford, either directly or through the OTA software update, but Ford has failed to repair them as required under its warranties and

instead issued an ineffective software update that has done nothing to repair the defective high-voltage battery main contactor.

617. Furthermore, the warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Subclass members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Instead, Ford has issued a software update that does not remedy the manufacturing defect in the Shutdown Risk Vehicles and instead decreases the engine and battery power, resulting in decreased performance and increased charging times.

618. Accordingly, recovery by Plaintiff and the other Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

619. Also, as alleged in more detail herein, at the time Ford warranted and sold the Shutdown Risk Vehicles, it knew that the Shutdown Risk Vehicles did not conform to Ford's warranties and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Shutdown Risk Vehicles. Plaintiff and the other Subclass members were therefore induced to purchase or lease the Shutdown Risk Vehicles under false and/or fraudulent pretenses.

620. Moreover, many of the injuries flowing from the Shutdown Risk Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Because of Ford's failure and/or continued failure to provide such remedy within a reasonable time, any limitation on Plaintiff's and the other Subclass members' remedies would be insufficient to make Plaintiffs and the other Subclass members whole.

621. Ford was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

622. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXXVI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NORTH CAROLINA LAW (N.C. Gen. Stat. § 25-2-314) (Alleged by Plaintiff Gutierrez on behalf of the North Carolina Subclass)

623. Plaintiff Gutierrez and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

624.  Plaintiff Gutierrez brings this action on behalf of himself and the North Carolina Subclass.

625.  Ford is a merchant with respect to motor vehicles within the meaning of N.C. Gen. Stat. § 25-2-104(1).

626.  Under N.C. Gen. Stat. § 25-2-314, a warranty that the Shutdown Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff Gutierrez and the North Carolina Subclass purchased or leased their Shutdown Risk Vehicles from Ford.

627.  The Shutdown Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of shutdown due to the Shutdown Risk described herein. Without limitation, the Shutdown Risk Vehicles share a common defect in that they are all equipped with the same high-voltage battery main contactors that make the vehicles susceptible to a risk of spontaneous shutdown, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Shutdown Risk Vehicles. The Shutdown Risk renders the Shutdown Risk Vehicles unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

628.  Plaintiff Gutierrez and the North Carolina Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers

who sold or leased the Shutdown Risk Vehicles to Plaintiff Gutierrez and the North Carolina Subclass members.

629. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Gutierrez and the North Carolina Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A. Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B. Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Shutdown Risk Vehicles, or the overpayment for their vehicles;

C. Damages, costs, and disgorgement in an amount to be determined at trial;

D. An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E. An award of costs and attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: October 17, 2023

Respectfully Submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
Shelby R. Smith
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
shelby@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Aashish Y. Desai
Adrianne De Castro
**DESAI LAW FIRM, P.C.**
3200 Bristol Street, Suite 650
Costa Mesa, CA 92626
Telephone: (949) 614-5830
Facsimile: (949) 271-4190
aashish@desai-law.com
adrianne@desai-law.com

*Attorneys for Plaintiffs*